Pages 1 - 89

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 22-CR-02701-BAS |
| | ) | |
| DONALD DANKS, JONATHAN | ) | |
| DESTLER, AND ROBERT LAZERUS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Wednesday, August 7, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL, DAY 6**

**(TESTIMONY OF JEREMY TARWATER)**

**APPEARANCES:**

For Plaintiff:
TARA K. MCGRATH
United States Attorney
880 Front Street, Room 6293
San Diego, California 92101
BY: **NICHOLAS W. PILCHAK, ESQ.**
**JANAKI GANDHI CHOPRA, ESQ.**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
LAW OFFICE OF PATRICK Q. HALL
402 West Broadway, Suite 1560
San Diego, California 92101
BY: **PATRICK Q. HALL, ESQ.**
**ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

**APPEARANCES**:    (CONTINUED)

For Defendant Jonathan Destler:
                        SNELL & WILMER
                        12230 El Camino Real, Suite 300
                        San Diego, California 92130
               BY:   **ANDREW PHILLIP YOUNG, ESQ.**
                     **ATTORNEY AT LAW**


                        MILLER BARONDESS, LLP
                        2121 Avenue of the Stars, Suite 2600
                        Los Angeles, California 90067
               BY:   **LOUIS "SKIP" MILLER, ESQ.**
                     **ATTORNEY AT LAW**

For Defendant Robert Lazerus:
                        LAW OFFICE OF MARTHA M. HALL
                        555 West Beech Street, Suite 508
                        San Diego, California 92101
               BY:   **MARTHA MCNAB HALL, ESQ.**
                     **ATTORNEY AT LAW**

                        LAW OFFICE OF ADAM F. DOYLE
                        444 West C Street, Suite 310
                        San Diego, California 92101
               BY:   **ADAM F. DOYLE, ESQ.**
                     **ATTORNEY AT LAW**

**I N D E X**

Wednesday, August 7, 2024 - Day 6

**GOVERNMENT'S WITNESSES**                                                **PAGE  DAY**

**TARWATER, JEREMY (RECALLED)**
(PREVIOUSLY SWORN)                                                          4    6
Cross-Examination (Resumed) by Mr. Young                                    4    6
Cross-Examination by Mr. Hall                                              46    6
Further Cross-Examination by Ms. Hall                                      58    6
Redirect Examination by Ms. Chopra                                        68    6
Recross-Examination by Mr. Young                                          82    6
Recross-Examination by Ms. Hall                                           84    6
Further Redirect Examination by Ms. Chopra                                88    6

**E X H I B I T S**

**GOVERNMENT'S EXHIBITS**                                  **IDEN**  **EVID**  **DAY**

 383                                                        72      72      6

 808                                                        74      75      6

**DEFENDANTS' EXHIBITS**                                   **IDEN**  **EVID**  **DAY**

 3259B                                                      59      60      6

1  **Wednesday - August 7, 2024**                              **8:34 a.m.**

2                      **P R O C E E D I N G S**

3                          **---000---**

4      (Proceedings were heard in the presence of the jury:)

5          **THE COURT:**  Okay.  We are back on the record.  All

6  jurors are present.  All defendants are present.

7      You're reminded you're still under oath to tell the truth.

8          **THE WITNESS:**  Yes, Your Honor.

9          **THE COURT:**  Mr. Young?

10         **MR. YOUNG:**  Thank you, Your Honor.

11                      **JEREMY TARWATER**,

12  called as a witness for the Government, having been previously

13  duly sworn, testified further as follows:

14                 **CROSS-EXAMINATION (RESUMED)**

15  **BY MR. YOUNG:**

16  **Q.**   Yesterday, we talked a little bit about nonpublic material

17  information, otherwise known as inside information.  You recall

18  that testimony; correct?

19  **A.**   Yes, sir.

20  **Q.**   All right.  And during your direct, you discussed some of

21  that type of information as well; correct?

22  **A.**   Yes.

23  **Q.**   I want to show you what's been marked as Exhibit 648,

24  Government's Exhibit 648, which is already in evidence.

25          **THE CLERK:**  It should be on the document --

 1          MR. YOUNG:  I'm on the right one.

 2          THE CLERK:  Yeah.

 3      Is it not showing?

 4          MR. YOUNG:  No.  It's showing my -- it's showing my

 5  hand on the little screen.

 6          THE CLERK:  Oh.  Weird.

 7      It's just -- try switching.

 8          MR. YOUNG:  All right.  I have it on the electronic --

 9  okay.  Let's just use my computer.

10  BY MR. YOUNG:

11  Q.   Now, this -- you testified yesterday about this

12  Exhibit 648.  Do you recall that?

13  A.   I am familiar with this exhibit, this email.

14  Q.   Right.

15      And this is a -- it starts off as an email from a

16  Nelson Switzer to a variety of people, and it cc's

17  Daniel Solomita.  It's on November 28th at 6:13 p.m.; correct?

18  A.   Yes, sir.

19  Q.   And it's announcing a -- scroll down -- an exciting

20  milestone, and it's announcing that Loop signed a deal with

21  Coca-Cola; correct?

22  A.   That's what it says, yes, sir.

23  Q.   Right.

24      And that's the Coca-Cola -- correct? -- the soda company?

25  A.   Yes.  It's a -- I think it's some affiliated company of

1   theirs, yes, sir.

2   **Q.**   And it's -- it's a deal to essentially recycle bottles

3   that Coca-Cola will then use for its products; correct?

4   **A.**   That's my understanding, yes, sir.

5   **Q.**   And this announcement is -- is initially sent by

6   Mr. Switzer to these other individuals.  It doesn't include any

7   of the defendants; correct?

8   **A.**   Correct.

9   **Q.**   Now, this -- was this -- this email was presented to the

10  jury.  Was the intent to show that this is the distribution of

11  inside information?

12          **MS. CHOPRA:**  Objection, Your Honor.

13          **THE COURT:**  Sustained.

14  **BY MR. YOUNG:**

15  **Q.**   Do you think this shows the distribution of inside

16  information?

17  **A.**   What I took from this is the fact that, though

18  Donald Danks was off the board, information from within the

19  company was getting emailed out to Jonathan Destler and

20  Donald Danks, but the release goes out the very next morning

21  premarket.

22  **Q.**   You're anticipating my next question because this email is

23  sent on the East Coast at 6:13 p.m. -- correct? -- the original

24  one?

25  **A.**   I'm not sure of the time zone, but that seems right.

1    **Q.**    Right.

2        And the markets close on the East Coast side at what time?

3    **A.**    4:00.

4    **Q.**    So no one can use -- actually use this information for

5    sort of any competitive advantage on the U.S. markets; correct?

6    **A.**    Not from this email, no, sir.

7    **Q.**    And -- and then when it's forwarded on from Mr. Solomita

8    to Mr. Danks and Mr. Destler, that's -- it says, military time,

9    3:53, but that's Pacific time; correct?

10   **A.**    That's my understanding, yes, sir.

11   **Q.**    Right.

12       And so they would have received this email with this

13   information after the markets have closed?

14   **A.**    At least from this email, yes, sir.

15   **Q.**    And -- and this is -- well, this is the only email that we

16   have that deals with this information; correct?

17   **A.**    The only email we have?  I can't be sure of that.

18   **Q.**    And this -- so Mr. Solomita -- I'm sorry.  Mr. Destler and

19   Mr. Danks getting this information after the market closed --

20   they can't use this for any competitive advantage; correct?

21   **A.**    This email itself, no.

22   **Q.**    In fact, you have -- you've seen their trading records;

23   correct?

24   **A.**    I've seen summaries of their trading records.

25   **Q.**    You have access to all their trading records for Loop;

1  correct?

2  **A.**  Correct.

3  **Q.**  And you've reviewed all the -- all the trading records for

4  Loop; correct?

5  **A.**  I have reviewed summaries of the trading records.

6  **Q.**  And neither Mr. Danks nor Mr. Destler traded on this

7  information; correct?

8  **A.**  I'm not sure, but it's not coming to mind that they did.

9  **Q.**  Now, you recall yesterday we talked a little bit about the

10  letter that the FBI sent out to purported victims after the

11  Government learned that Mr. Brennan had actually made money in

12  Loop, not lost money; correct?

13  **A.**  We discussed letters from the Government the FBI sent out,

14  yes, sir.

15  **Q.**  Okay.  I want to --

16       **MR. YOUNG:**  Stephanie, can you --

17       **THE WITNESS:**  And to clarify, sir, I think there was

18  two -- two letters, not just one.

19  **BY MR. YOUNG:**

20  **Q.**  Do you recall yesterday when I asked if you got -- if the

21  FBI got any responses back that were, in sum -- in sum, "We

22  don't think this was a crime.  We don't think this was a fraud.

23  We don't consider ourselves to be victims"?

24  **A.**  I can tell you what I heard through other agents.  Is that

25  what you're asking?

1   **Q.**   Well, I don't want you to say what you heard from other

2   agents in substance, but did you talk to other agents about it?

3   **A.**   Yes.

4   **Q.**   And what agents did you talk to about it?

5   **A.**   David Patterson and Amanda Stewart.

6   **Q.**   And did -- did those agents tell you that they had

7   received letters back?

8           **MS. CHOPRA:**  Objection.  Hearsay.

9           **THE WITNESS:**  Letters back?

10          **THE COURT:**  Sustained.

11  **BY MR. YOUNG:**

12  **Q.**   Now, you're the lead case agent in the -- the colead case

13  agent in the case; correct?

14  **A.**   Yes, sir.

15  **Q.**   And it's your job to make decisions about who to interview

16  and who not to interview; correct?

17  **A.**   In coordination with the prosecution team, yes, sir.

18  **Q.**   And you had conversations with the prosecution team?

19  **A.**   Yes.

20  **Q.**   And without telling me the names on those letters or the

21  substance of those letters, did you -- was the substance of the

22  letters relayed to you?

23  **A.**   I'm not sure which letters you're talking about, sir.

24  Sorry.  Did you say we got letters back?  Is that what you

25  said?

1  **Q.**  Yes, letters in response to the letter that the FBI sent

2  out to, quote/unquote, "purported victims."

3  **A.**  I recall an email we got in response.  Maybe we got a

4  letter.  I can't recall if it was a letter or an email, but we

5  certainly received responses to the letter.

6  **Q.**  And is it fair to say that you received some responses

7  that -- where people said, "We don't think we're a victim," and

8  then some people -- some letters where people thought that they

9  were?

10  **A.**  Yes.

11  **Q.**  And did the response to those letters -- after reviewing

12  and getting that information, did that cause you to do any --

13  take any investigative steps?

14  **A.**  I think we attempted to interview the people that

15  responded.

16  **Q.**  In fact, you interviewed the people who responded that

17  they were victims; correct?

18  **A.**  I recall one person who I don't think thought he was a

19  victim, and he was also interviewed.

20  **Q.**  Did you review -- did you interview everybody who said

21  that they weren't a victim?

22  **A.**  Some people weren't interested in talking.  So we couldn't

23  interview them.  Phone calls were made.  Some people didn't

24  call back.  I think phone calls were made, and sometimes they

25  said, "I'm not really interested in talking about it."  So

1   sometime -- mixed results.

2   **Q.**   So my question was a little bit more simple.

3   **A.**   Okay.

4   **Q.**   Did you -- did you talk to people who said they were not

5   victims?

6   **A.**   Yes.

7   **Q.**   Okay.  Do you recall any of their names?

8   **A.**   Chester Griffiths.

9   **Q.**   Anyone else?

10  **A.**   There were other people who weren't sure whether they were

11  a victim or not.  I think he was the -- the strongest thinking

12  he wasn't.  I'd have to review the 302s, but --

13  **Q.**   Does the name Dave -- David Farmer [sic] mean anything to

14  you?

15  **A.**   The name's familiar, but I don't recall.  If you want to

16  refresh my memory, I'm happy to look.

17  **Q.**   Certainly.

18         **THE CLERK:**  Did you want something on his screen?

19         **MR. YOUNG:**  Yeah.

20         **THE CLERK:**  Okay.  Hold on just a second.  I'm going

21  to unmute them all.

22         **MR. YOUNG:**  Sure.

23         **THE CLERK:**  Just a second.

24  BY MR. YOUNG:

25  **Q.**   Do you see on your screen what's been previously marked as

1   Exhibit 2033?

2   **A.**   I see --

3   **Q.**   I'm sorry.  Yes, 2033.

4   **A.**   Yes.

5   **Q.**   And does that help refresh your recollection as to an

6   individual named Jeff -- Jeff Farmer?

7   **A.**   I -- I see the name Jeff Farmer here.  It's an email to

8   Special Agent David Patterson.

9   **Q.**   Does that help refresh your recollection as to any

10  conversations with -- with just the individual Jeff Farmer?

11  **A.**   No, but I do remember Agent Patterson saying some people

12  responded in various ways, like we just discussed, "I'm not a

13  victim.  I'm not sure if I'm a victim.  I'm not interesting in

14  speaking."  So this fits that general conversation.

15  **Q.**   And do you recall whether any of the FBI agents

16  interviewed Mr. Farmer?

17  **A.**   I -- I don't recall seeing an interview of Mr. Farmer.

18  **Q.**   Mr. Farmer was one of the individuals who expressed a

19  belief that he was not a victim; correct?

20  **A.**   From reading this email, that's what it looks like.

21  **Q.**   Do you have a specific recollection of that?

22  **A.**   I do not.

23  **Q.**   And --

24          **MR. YOUNG:**  Can you just mute it for one second?

25          **THE CLERK:**  The whole thing?

1          **MR. YOUNG:**  Yeah.

2       I don't want to taint this --

3    **BY MR. YOUNG:**

4    **Q.**  Do you recall an individual named Terry Sheward?

5    **A.**  I do not.

6    **Q.**  Would it help refresh your recollection to see any -- any

7    correspondence from Ms. Sheward?

8    **A.**  Yes, sir.  Sure.

9          **MR. YOUNG:**  Can you show him what's been previously

10   marked as Exhibit 2023?

11         **THE CLERK:**  Just a second.  Okay.

12   **BY MR. YOUNG:**

13   **Q.**  Just take a moment to read that.

14   **A.**  Yes, sir.

15      Okay.

16   **Q.**  Does that help refresh your recollection as to

17   Terry Sheward?

18   **A.**  Not the name in particular, but I see that that person

19   indicated they don't think they're a victim.

20   **Q.**  And -- and do you know if Terry Sheward is a man or a

21   woman?

22   **A.**  I do not, no, sir.

23   **Q.**  Do you know if he or she was ever interviewed?

24   **A.**  I -- if they were, I don't recall reviewing the interview.

25   **Q.**  Okay.  So if she -- if he or she wasn't interviewed, the

1  FBI made a decision not to interview this person?

2  **A.**   Or an interview was attempted, and they declined.  I don't

3  know which.  Either way -- either way, I don't recall reviewing

4  the interview.  So --

5  **Q.**   And if an interview was attempted and declined, you

6  wouldn't write that up?

7  **A.**   Well, it wouldn't have been me doing it, but if they

8  provided some kind of information, it should be documented.

9  **Q.**   And so --

10  **A.**   If they simply refused to be interviewed, then perhaps

11  not.

12  **Q.**   And those -- those reports are all called -- they're

13  called a 302; correct?

14  **A.**   Yes, sir.  That's the number assigned, yes, to the form.

15  Yeah.

16  **Q.**   Right.

17       It's like a Form 302?

18  **A.**   Yes, sir.

19  **Q.**   And that's the form the FBI uses to document virtually

20  everything it does; correct?

21  **A.**   No, but all the interviews.

22  **Q.**   Now, the FBI doesn't just document interviews, though;

23  correct?

24  **A.**   Correct.

25  **Q.**   If the FBI conducts surveillance, it documents that in a

1    302; correct?

2    **A.**    Yes, sir.

3    **Q.**    And if it -- if it gets exhibits -- or evidence in -- from

4    a response to subpoena documents, it's provided in a 302;

5    correct?

6    **A.**    Or a different form, but yeah.  Either way, it's

7    documented, yes, sir.

8    **Q.**    And the best practices with the FBI is to document as much

9    as you possibly can about what happened in the investigation;

10   correct?

11   **A.**    Yeah.

12   **Q.**    And there's no rule that says you shouldn't document an

13   attempted interview; correct?

14   **A.**    There's no rule prohibiting that, no, sir.

15   **Q.**    And there's -- but there's no rule saying you should, and

16   there's no rule saying you shouldn't; correct?

17   **A.**    If any information is provided, then it should be

18   documented.  The absence of anything happening might not be

19   documented.

20   **Q.**    And, in fact, the 302s are the sole document -- sole

21   official documentation of everything that happens in an

22   investigation; correct?

23   **A.**    For interviews, yes, sir.

24   **Q.**    For more than interviews?

25   **A.**    More than interviews, yeah.

| | |
|---|---|
| 1 | **Q.**   Surveillance? |
| 2 | **A.**   Surveillance. |
| 3 | **Q.**   Receipt of evidence? |
| 4 | **A.**   That could be through an EC -- a 1057, but -- |
| 5 | **Q.**   But that's documented? |
| 6 | **A.**   That's documented, yes, sir. |
| 7 | **Q.**   Now, you've obviously heard the name Daniel Solomita |
| 8 | ad nauseam at this point; correct? |
| 9 | **A.**   I've heard the name many times, yes, sir. |
| 10 | **Q.**   And Mr. Solomita is a resident of Canada; correct? |
| 11 | **A.**   That's my understanding, yes, sir. |
| 12 | **Q.**   And the FBI did not interview Mr. Solomita, did they? |
| 13 | **A.**   We did not. |
| 14 | **Q.**   And, in fact, Mr. Solomita has been back to the |
| 15 | United States several times since this case was indicted; |
| 16 | correct? |
| 17 | **A.**   I don't know since indictment, but during the course of |
| 18 | the investigation, he had entered the United States several |
| 19 | times. |
| 20 | **Q.**   Okay.  And during that, the FBI did not interview him; |
| 21 | correct? |
| 22 | **A.**   No. |
| 23 | **Q.**   And the FBI has the ability to put out an alert to see if |
| 24 | somebody is coming into the U.S.; isn't that correct? |
| 25 | **A.**   We do, yes. |

1   **Q.**   And the FBI -- after this case was indicted, the FBI never

2   put an alert on Mr. Solomita, did they?

3   **A.**   No.  We did have an alert on Mr. Solomita.

4   **Q.**   So if Mr. Solomita came into the country, the FBI knew

5   about it?

6   **A.**   At some point in time, yes, sir.

7   **Q.**   And despite knowing that he's coming into the

8   United States, the FBI made no attempt to interview him?

9   **A.**   The periods that I, for sure, can recall him coming in --

10  the undercover operation was still going, and we were remaining

11  covert, but no.  Either way, we had never interviewed him.

12  **Q.**   Okay.  I may have misspoke.

13       After the indictment was returned, which -- by that point,

14  the undercover is completed?

15  **A.**   Yes, sir.

16  **Q.**   After the indictment was returned, Mr. Solomita has come

17  to the United States multiple times; correct?

18  **A.**   I -- I can't recall the dates, if he -- if he came after

19  or not, but I assume you're correct.  I'll take your word for

20  it.

21  **Q.**   There's been investment conferences that he's attended;

22  correct?

23  **A.**   I don't know what dates, but I'm sure -- I'm sure that's

24  true.

25  **Q.**   Okay.  And some of those investment conferences are just

1    up the road in Orange County; correct?

2    **A.**   I know, in the past, he has gone to Orange County, yes,

3    sir.

4    **Q.**   And the FBI didn't attempt to interview him on any of

5    those trips, obviously?

6    **A.**   I think the U.S. Attorney's Office tried to contact his

7    attorneys to see if an interview could be arranged, but we did

8    not just try to interview him.

9    **Q.**   You also could have given him a subpoena to testify here;

10   correct?

11   **A.**   I can't, but yes, the Government could have.

12   **Q.**   Right.

13       And the Government didn't give him a subpoena on any of

14   those occasions that he came into the United States?

15   **A.**   No, sir.

16   **Q.**   Now, we've heard about various individuals from

17   Blacklight.  We've heard a lot about Blacklight in this case;

18   correct?

19   **A.**   Yes, sir.

20   **Q.**   And those are all individuals who live in Europe; correct?

21   **A.**   Yes, I believe they all still -- currently?  Yes.

22   **Q.**   And the F- -- you didn't attempt to interview any of those

23   individuals, did you?

24   **A.**   They were interviewed many times by the FBI, not me

25   personally.

1   Q.   Which individuals from Blacklight were interviewed by the

2   FBI?

3   A.   Anthony Killarney, Kenneth Ciapala -- and I can't remember

4   Roger Knox, but at the point of this that we've been discussing

5   them, Roger Knox was out of the picture.  So the other two

6   founders and principals had been interviewed many times by the

7   FBI.

8   Q.   And they, too, could have been given subpoenas to come

9   here and testify; correct?

10  A.   Yes.

11  Q.   And the Government chose not to issue them subpoenas to

12  come here and testify; true?

13  A.   Correct.

14  Q.   Now, I want to turn for a second to the -- the statement

15  that you described in your testimony about -- that Mr. Destler

16  gave in the fall of, say, 2022.  Do you recall that?

17  A.   Yes, sir.

18  Q.   And just for a moment, I want to compare that to some of

19  the statements that Mr. Bajic has given to the Government.

20  There's a term we're all familiar with, what's called

21  "proffer."  You understand that; correct?

22  A.   Yes.

23  Q.   And a proffer agreement with Mr. Bajic was that he would

24  come in.  He would talk to the Government.  The Government

25  agreed not to use anything he said against him; correct?

1   **A.**   As long as he's truthful, yes, sir.

2   **Q.**   Right.

3        And so it's -- the colloquial of that is called a

4   Queen for a Day letter?

5   **A.**   It is.

6   **Q.**   And he comes in.  He tells -- he gives the facts.  He

7   answers questions to the Government.  They're not allowed to

8   use any of that against him; correct?

9   **A.**   In their case-in-chief, yes.

10  **Q.**   Right.

11       And the -- now -- but if he does -- part of that is they

12  can use it against him if he lies; correct?

13  **A.**   Yes, sir.

14  **Q.**   Now, Mr. Destler also came in for a proffer, didn't he?

15  **A.**   He came in for an interview.

16  **Q.**   It's -- it was referred to as an innocence proffer; isn't

17  that correct?

18  **A.**   By whom?

19  **Q.**   You've never heard of that term?

20  **A.**   I have, but you said it was referred to as an innocence

21  proffer.  I don't know who.

22  **Q.**   The -- the understanding between the Government and

23  Mr. Destler was -- and you were there; correct?

24  **A.**   I was at the interview, not discussions before.

25  **Q.**   Okay.  So you never heard the term "innocence proffer"

1  used in the context of Mr. Destler's interview?

2  **A.**   I've heard someone call it that, yes, sir.

3  **Q.**   Okay.  Who was that?

4  **A.**   I think the prosecutor might have said he wants to come in

5  for an innocence proffer.

6  **Q.**   Now, unlike the proffers that Mr. Bajic did, Mr. Destler

7  didn't receive any protections, did he?

8  **A.**   I don't recall any, no, sir.

9  **Q.**   He was told, at the beginning of the interview, "Anything

10  you say can" -- "can be used against you"; correct?

11  **A.**   If he was, I don't recall that, but he didn't have the

12  protections you were speaking of with Mr. Bajic.

13  **Q.**   Right.

14      So anything he said, the Government was free to come in

15  here and -- and talk about it; correct?

16  **A.**   Yes, sir.

17  **Q.**   And that was discussed at the beginning of that meeting,

18  wasn't it?

19  **A.**   That was.

20  **Q.**   And that meeting was about two hours long, wasn't it?

21  **A.**   That sounds right.

22  **Q.**   And he was asked two hours' worth of questions; correct?

23  **A.**   In the beginning, they -- he made his own statements, and

24  then he was asked questions by the Government, yes, sir.

25  **Q.**   And that -- that -- that interview was about six weeks

1  before the indictment was returned; correct?

2  **A.**   That sounds about right.

3  **Q.**   Now, you said something in your testimony earlier today

4  about 5 percent.  Do you recall that?

5  **A.**   I do.

6  **Q.**   And I think the question and the answer was something

7  along the lines of he was -- he knew he was -- he was aware of

8  the 5 percent rule; correct?

9  **A.**   My recollection is he said he wasn't trying to avoid the

10  5 percent disclosure.

11  **Q.**   Okay.  I think that's more accurate.  That's better than

12  my memory.

13       He said he wasn't trying to avoid the 5 percent rule;

14  correct?

15  **A.**   Yes, sir.

16  **Q.**   But the conversation on that day was a little bit more

17  specific, wasn't it?

18  **A.**   It was actually much broader than that.  So I don't -- I'm

19  not following your question.

20  **Q.**   He was asked specifically about an application that he

21  made to Wilson-Davis, wasn't he?

22  **A.**   I think he was.

23  **Q.**   And that was -- essentially, the question was did he

24  actually have -- owned 6 percent of Loop when he filled out

25  that application because, on the application, he put 4.6;

1  correct?

2  **A.**   That's familiar.  I can't exactly recall from that

3  interview, but I do recall the document and discussions around

4  that.

5  **Q.**   All right.  So it wasn't as broad as sort of 5 percent.

6  There was a specific discussion about a specific event;

7  correct?

8  **A.**   I think that's right.

9  **Q.**   Right.

10       And it was -- he filled out an application with a

11 brokerage firm where he said he's not over 5 percent; correct?

12 **A.**   Correct.

13 **Q.**   And you've read the indictment in this case; correct?

14 **A.**   Yes.

15 **Q.**   And that's an overt act in the indictment, isn't it?

16 **A.**   I'd have to look back at the indictment.

17 **Q.**   Okay.  Would it help refresh your recollection to see the

18 indictment?

19 **A.**   If you wish, yes, sir.

20          **MR. MILLER:**  Andrew.

21          **MR. YOUNG:**  I have it.

22       May I approach, Your Honor?

23          **THE COURT:**  You may.

24          **THE WITNESS:**  Thank you, sir.

25 ///

1   **BY MR. YOUNG:**

2   **Q.**   You bet.

3   **A.**   Okay.  That refreshes my memory.

4   **Q.**   All right.  So that -- that specific act is in the

5   indictment; correct?

6   **A.**   Yes, sir.

7   **Q.**   Which means that specific act was presented to the grand

8   jury; correct?

9   **A.**   I -- I have no knowledge of what was presented to the

10  grand jury.

11  **Q.**   Because you didn't testify?

12  **A.**   Correct.

13  **Q.**   Do you remember the name of the agent who did testify yet?

14  **A.**   I believe it was Todd Townsend.

15  **Q.**   Now, that 4.6 arises from -- or 4.6 versus 6.1 arises from

16  the fact that, in the aggregate, Mr. Destler owned 1.8 million

17  shares of Loop; correct?

18  **A.**   Off memory, I think that's correct.

19  **Q.**   So he got 1 million restricted shares; correct?

20  **A.**   At one point in time, yes.

21  **Q.**   And he got 8- -- 800,000 of unrestricted shares; correct?

22  **A.**   By "he," you just mean Touchstone Advisors?

23  **Q.**   Touchstone Advisors.

24  **A.**   Yes.

25  **Q.**   And 1-point -- will you take my word for it that

1  1-point -- 1.8 of the total outstanding shares was around

2  6 percent?

3  **A.**   I'll take your word for it.

4  **Q.**   Okay.  And 400-, 500,000 left -- fewer than that.

5       So 1.3 million is about 4 and a half percent.  Take my

6  word for it?

7  **A.**   I'll take your word for it.

8  **Q.**   Okay.  Now, at the time the indictment was returned, had

9  anyone from the FBI interviewed a Greg Olafson?

10        **THE COURT:**  I'm sorry.  I missed that.

11       Interviewed who?

12        **MR. YOUNG:**  Greg Olafson.

13        **THE COURT:**  Thank you.

14        **MR. YOUNG:**  O-l-a-f-s-o-n.

15        **THE COURT:**  Thank you.

16        **THE WITNESS:**  At the time of the indictment --

17  indictment being returned?

18  **BY MR. YOUNG:**

19  **Q.**   Yes, or before.

20  **A.**   I don't recall.

21  **Q.**   Had anybody interviewed a Jodd Readick, R-e-a-d-i-c-k?

22  **A.**   Not that I recall.

23  **Q.**   Had anyone from the FBI interviewed a John Clinton

24  Selfridge -- Selfridge, S-e-l-f-r-i-d-g-e?

25  **A.**   Not that I recall.

1  **Q.**   Had anyone from the FBI interviewed a Henry Lorin,

2  L-o-r-i-n?

3  **A.**   No, we did not.

4  **Q.**   Did you know of a Henry Lorin at the time?

5  **A.**   Yes.

6  **Q.**   Did you know that any of the previous individuals that I

7  just mentioned existed?

8  **A.**   I'm not familiar with those names, but I am familiar with

9  Henry Lorin's name.

10 **Q.**   And did anybody from the FBI interview a Tony Douglas?

11 **A.**   Not that I recall.

12 **Q.**   Did anybody from the FBI interview a James Harrison?

13 **A.**   Yes.

14 **Q.**   So you had interviewed James Harrison?

15 **A.**   At some point in time, yes, sir.

16 **Q.**   Do you recall whether that was before the indictment was

17 returned or after?

18 **A.**   My best memory is that it occurred after the search

19 warrant of Mr. Danks's house.  It's been -- everyone knew about

20 our investigation.  So I know it followed that search warrant,

21 which was September of 2022.

22 **Q.**   Okay.  So the search warrant was September 2022.  The

23 meeting at the U.S. Attorney's Office, the innocence proffer,

24 which is what I'm referring to it as --

25 **A.**   Yes, sir.

1  Q.   -- was in -- after the search warrant; correct?

2  A.   October 2022, yes, sir.

3  Q.   And then the indictment was returned about a month later?

4  A.   Yes, sir.

5  Q.   Now -- so was the FBI -- or was the case team -- you,

6  Mr. Patterson -- aware that Mr. Destler had sold his -- a

7  significant portion of his restricted stock to the individuals

8  I just identified there?

9  A.   The forensic accountant probably knows, but I don't have

10  those details in my head, no, sir.

11  Q.   Okay.  But the forensic accountant was working on this

12  case before it was indicted; correct?

13  A.   Correct.

14  Q.   And so he never told you that Mr. Destler had sold

15  approximately 400,000 to 450,000 share -- restricted shares

16  before he applied for a brokerage account at Wilson-Davis?

17  A.   I don't recall a conversation like that, no.

18  Q.   So if there was evidence that those transactions were

19  finished/completed, that would be news to you?

20  A.   It would be news to me that the forensic accountant told

21  me that he sold those shares right at the time of the

22  application.  We never had a conversation like that.

23  Q.   And so -- you sell a share when you enter an agreement

24  with them; correct?

25  A.   Typically, yes.

1  **Q.**    And you get money back in exchange for the share?

2  **A.**    That would be the typical way.

3  **Q.**    So agreement, money?

4  **A.**    Well, not in this case.  Sometimes money was sent.

5  Agreements were done later.  Shares were sent afterwards.  So

6  they didn't necessarily line up like you would normally expect.

7  **Q.**    Right, but the agreement to sell the share is -- you're a

8  lawyer; right?  Offer -- Contracts 101 is offer, acceptance,

9  and consideration; correct?

10  **A.**    Yes.  Yep.

11  **Q.**    Consideration, essentially, is money that's exchanged?

12  **A.**    Correct.

13  **Q.**    And so once the money is exchanged for the shares, the

14  beneficial owner of that share is the person who paid the money

15  for it?

16  **A.**    It -- that should be the way it goes, yes.

17  **Q.**    Right.

18       And so once that's complete, the shares have changed

19  hands?

20  **A.**    Correct.

21  **Q.**    And so if those -- if those -- if the money had exchanged

22  hands, for example, in the January-to-June period of 2015,

23  these individuals would be the owners of those shares; correct?

24  **A.**    If money is exchanged, and the shares were exchanged, then

25  the transaction has been consummated, yes.

1  **Q.**   Okay.  And if that happened or if it didn't happen, the

2  FBI just didn't investigate it?

3  **A.**   No.  Like I said, we were investigating the movement of

4  money and shares.  I mean, your hypothetical -- I don't have

5  information on it, no.

6  **Q.**   Now, I want to return back to the concept I just brought

7  up, which is beneficial owner.

8      You're familiar with the term "beneficial owner"?

9  **A.**   Yes, sir.

10  **Q.**   That's the person who actually owns the stock; correct?

11  **A.**   Or -- or whatever you own, yes, sir.

12  **Q.**   The security in this case?

13  **A.**   In this case, yes, sir.

14  **Q.**   And for -- for security, it's the person who gets the

15  proceeds of any stock -- stock sales?

16  **A.**   That could be one way, yes.

17  **Q.**   One part of it?

18  **A.**   Yeah.

19  **Q.**   And another would be whether somebody has -- exercises the

20  voting rights over those securities; correct?

21  **A.**   That's right, yep.

22  **Q.**   So gets the proceeds of the sales, exercises voting

23  rights; correct?

24  **A.**   Those are all indicia of being the beneficial owner, yes.

25  **Q.**   Is there any other indicia?

1  **A.**   Well, if you can direct the movement of the shares or

2  direct the proceeds to someone else, then you're exercising

3  control over it as the beneficial owner.  You don't have to

4  receive it yourself, but --

5  **Q.**   Understood, but you still -- the proceeds still is the

6  sort of -- the core that holds that together; correct?  You may

7  not get it yourself, but you're directing where it goes.  Is

8  that fair?

9  **A.**   Typically, yes.  Yeah.

10 **Q.**   Okay.  And in this investigation, you had access to all of

11 Touchstone's bank records; correct?

12 **A.**   You mean all of Touchstone's when you say "Touchstone"?

13 **Q.**   Right.

14 **A.**   Yes.

15 **Q.**   And you had access to its tax returns?

16 **A.**   I don't believe we had their tax returns.

17 **Q.**   You could have gotten their tax returns if you wanted to;

18 correct?

19 **A.**   We could make an ex parte to the Court to get them, yes.

20 **Q.**   You've done that before?

21 **A.**   I have.

22 **Q.**   You know how to do it?

23 **A.**   Well, I don't do it, but yes.  The Government can do it,

24 yes, sir.

25 **Q.**   You asked -- you asked the prosecutors to do it?

```
 1   A.   Yes.

 2   Q.   And you've gone through that process before; correct?

 3   A.   Yes, sir.

 4   Q.   So it's -- it's legally possible to get someone's tax

 5   returns in an investigation like this; correct?

 6   A.   Yes.  Yes.

 7   Q.   And all you'd need to -- do you know what you need to show

 8   to get those tax returns?

 9   A.   I don't.

10   Q.   Now, you also knew who Touchstone Advisors -- all the

11   Touchstone entities -- who their accountant was; correct?

12   A.   I don't have the name in my head, but I -- I think that

13   came up in the investigation.

14   Q.   All right.  So you could have interviewed that individual;

15   correct?

16   A.   Yes.

17   Q.   And I understand you would want to wait until after the UC

18   is over to conduct that interview, but you could have done it

19   at that point; correct?

20   A.   We could have sought that interview, yes.

21   Q.   And you could have given them a subpoena to appear in

22   front of the grand jury if he refused; correct?

23   A.   Before the indictment, yes.

24   Q.   And that's true of anybody that -- before the indictment,

25   that's true of anybody -- any individual?  The Government could
```

1  compel them to go in to the grand jury and provide evidence;

2  correct?

3  **A.**   If we could serve them and had jurisdiction, yes, sir.

4  **Q.**   Right.

5       And jurisdiction extends to the entire United States;

6  correct?

7  **A.**   Right.  I just meant we couldn't subpoena someone out of

8  the country, yeah.

9  **Q.**   Right, but you can also -- just because you brought it up,

10  you can go outside the country and interview people; correct?

11  **A.**   That is possible, yeah.

12  **Q.**   And if the country over there that you're working with

13  will permit it, you can actually compel an interview there;

14  correct?

15  **A.**   Depends on the country, yep.

16  **Q.**   So you have -- you have the ability to interview anybody

17  who's voluntarily willing to give you an interview in the U.S.?

18  **A.**   Yes, sir.

19  **Q.**   If they don't volunteer to give you an interview in the

20  U.S., you can compel them to come in and testify to the grand

21  jury; correct?

22  **A.**   With certain restraints, yes.

23  **Q.**   And you can ask a foreign country to help you interview a

24  citizen of their country; correct?

25  **A.**   We could, yes, sir.

1  **Q.**   And if that country will permit it, you can actually

2  compel them to give you testimony; correct?

3  **A.**   Depending on the country, yes.

4  **Q.**   And you can compel them to give you testimony even

5  after -- in a foreign country even after the indictment has

6  been returned; correct?

7  **A.**   I've heard that happening in certain countries, yes, sir.

8  **Q.**   And with regard to any of the individuals we've been

9  talking about, those efforts weren't made at all for any of

10 those individuals I've already identified today; correct?

11 **A.**   You've identified a lot of individuals, but you named some

12 that we haven't -- we did not interview.

13 **Q.**   Now, you've looked at the Touchstone entities' bank

14 accounts; correct?

15 **A.**   Summaries.

16 **Q.**   Summaries.

17     The forensic accountant has looked at all those accounts;

18 correct?

19 **A.**   That's correct, yeah.

20 **Q.**   And he's had access to -- strike that.

21     You've had access to -- let me take a step further back.

22     Did you make any attempts to get the bills for any of the

23 Touchstone entities?

24 **A.**   The bills?

25 **Q.**   Bills.  Utilities?  Lease?  Credit cards?

1    **A.**    I don't know -- we might have tried to get credit cards,

2    but I can't recall.

3    **Q.**    Right.

4          And you get those credit cards to see who's paying them

5    off; correct?

6    **A.**    Or -- or what's being paid for, yes, sir.

7    **Q.**    And that's -- that's true of not just Touchstone but any

8    of the entities in this case; correct?

9    **A.**    That's what a credit card would show, yes.

10   **Q.**    Right.

11         And the FBI and its forensic accountants and its tools has

12   the ability to trace the proceeds to see where they go;

13   correct?

14   **A.**    Correct.

15   **Q.**    And it's not just "Go hit the bank account."  You go

16   further; correct?

17   **A.**    If the type of investigation calls for it, yes.

18   **Q.**    You look to see if credit card bills were paid off;

19   correct?

20   **A.**    Yes.

21   **Q.**    You look to see if leases were -- mortgages were paid?

22   **A.**    You -- you could, depending on the investigation.

23   **Q.**    Car payments?  Essentially, everything that you pay for in

24   regular life, the FBI has the ability to look through all

25   those -- follow those tentacles all the way to the end;

```
 1   correct?
 2   A.   I -- if it's in the United States, usually.  If -- if it
 3   goes offshore, that's different, but --
 4   Q.   If it goes offshore, though, you'll see it go offshore?
 5   A.   We don't know where it goes from there, but yes, exactly.
 6   Q.   But that's what -- you could still see the outgoing wire
 7   go to an offshore account; correct?
 8   A.   If it's a wire, yes.
 9   Q.   All right.  Now, in addition to the -- all the financial
10   records that the FBI either has or has the ability to get, you
11   also had the corporate documents for the Touchstone entities;
12   correct?
13   A.   Correct.
14   Q.   Now, Touchstone Advisors, Inc. -- that's a C corp;
15   correct?
16   A.   I believe that's right.
17   Q.   And a C corp is, like, a corporation has shareholders;
18   correct?
19   A.   Yes.
20   Q.   And you've looked at the incorporation documents for
21   those -- for Touchstone Advisors, Inc.; correct?
22   A.   The articles, yes.
23   Q.   And -- and Don Danks isn't on any of those documents, is
24   he?
25   A.   For Touchstone Advisors?
```

1    **Q.**    Inc.

2    **A.**    No.

3    **Q.**    And the Touch- -- a C corp doesn't have a managing

4    director, does it?

5    **A.**    I mean, companies use titles however they want.  So -- I

6    mean, you could -- a corporation could have a title of managing

7    director if it so chose.

8    **Q.**    That's -- that's your opinion?

9    **A.**    Yeah.  A company -- the Board of Directors could

10    designate, "This is a position, and we're going to call it

11    'Managing Director,'" and they could put someone in that

12    position.  But it wouldn't be someone who was part of

13    incorporating the entity, but yes.

14    **Q.**    And on -- but on the corporate documents, that title is

15    not anywhere on there; correct?

16    **A.**    Not in the incorporation documents, no.

17    **Q.**    And with regard to Touchstone Advisors, LLC, that's a

18    limited liability company; correct?

19    **A.**    Yes, sir.

20    **Q.**    And limited liability companies don't have managing

21    directors; correct?

22    **A.**    Again, if you created the title, you could, but it's not

23    typical.

24    **Q.**    If you -- if you created a title that has -- well, I'll

25    just leave that.  I'll let that go.

1      In your direct testimony, you did say something

2  interesting with regard to Touchstone Capital Advisors.  Do you

3  remember that?

4  **A.**   I remember talking about it, yes.

5  **Q.**   And you testified that that was a dba?

6  **A.**   I think I testified it seemed to act sort of like a dba.

7  **Q.**   And what is a dba?

8  **A.**   Like, "doing business as."

9  **Q.**   And that's -- and that's not a technical legal entity;

10  correct?

11  **A.**   No.

12  **Q.**   It's more like a brand; correct?

13  **A.**   Yeah.

14  **Q.**   Now, just a few more questions for me.  I want to return

15  to your undercover work with Mr. Lazerus.

16      You met with Mr. Destler, in the capacity as Jay Taylor,

17  for approximately a three-hour dinner; correct?

18  **A.**   Something along that, yes.

19  **Q.**   And that was the only time that you met with Mr. Destler;

20  correct?

21  **A.**   As Jay Taylor, yes, sir.

22  **Q.**   As Jay Taylor.

23      And during that -- the premise of that dinner was so that

24  he could talk to you about Opti-Harvest, which is a company

25  that he started; correct?

1    **A.**    Mr. Lazerus said he would talk to me about Loop and

2    Opti-Harvest.

3    **Q.**    Now, how long would you say the dinner was?  Two or three

4    hours?

5    **A.**    Probably, yes.

6    **Q.**    The vast majority of that time, Mr. Destler talked about

7    Opti-Harvest; isn't that correct?

8    **A.**    That's fair, yes.

9    **Q.**    And Opti-Harvest is not a public company, is it?

10   **A.**    Correct.

11   **Q.**    It's a private company?

12   **A.**    Correct.

13   **Q.**    And I believe you testified that your job, as an

14   undercover, was to develop -- is to develop evidence; correct?

15   **A.**    Correct.

16   **Q.**    And to corroborate evidence; correct?

17   **A.**    Correct.

18   **Q.**    And I think the two -- two clips that were played from

19   that dinner were probably about six minutes?

20   **A.**    I can't recall, but a short period of time.

21   **Q.**    And you -- in preparation for this trial, you went back

22   and listened to the tape; correct?

23   **A.**    Yes.

24   **Q.**    And you listened to it for -- for evidence that's

25   worthwhile to present in front of the -- the jury; correct?

1  **A.**    Yes.

2  **Q.**    Now, I want to talk a little bit about a conversation that

3  you had with Mr. Lazerus in the May 20th, 2021/May 21st, 2021,

4  period that's leading up to the SK Global Group.

5  **A.**    Okay.

6  **Q.**    Do you remember that?

7      And that's -- if you recall yesterday, we finished with

8  the -- asking you questions about whether you were aware

9  South Korea trading guys were buying Loop leading up to that

10  announcement.  Do you -- you recall that testimony?

11  **A.**    I recall the question, yes, sir.

12  **Q.**    And that discussion that you had with Mr. Lazerus about

13  the SK Global deal was related -- is the same deal that's

14  reflected with the -- that's leading up to this South Korea

15  trade.  You understand that connection?

16  **A.**    I understand you made that connection, but when you showed

17  me a chart, that was the SK release, and then you were -- we

18  kind of stopped right there, but you had -- things happened

19  before that.

20  **Q.**    Okay.  And so there's -- there's trading in South Korea.

21  Do you have any understanding now of whether there was trading

22  in South Korea of Loop before the SK Global deal was announced?

23  **A.**    Was there trading in Loop before the SK release?

24  **Q.**    Yes.

25  **A.**    I don't know either way.  I --

1  **Q.**   Did you go look last night?

2  **A.**   I went last night and found the FINRA referral regarding

3  that release.

4  **Q.**   Okay.  Did you go look at the blue sheets to see if any of

5  those entities were trading in Loop stock before the release?

6  **A.**   The --

7  **Q.**   Before the press release announcing the SK Global deal?

8  **A.**   The entities in the FINRA referral?  Is that your

9  question?

10  **Q.**   We'll start with that, yes.

11  **A.**   Oh.  No, I did not go back last night and look at the blue

12  sheet.  I just read the referral and sent it at the request of

13  the Government.

14  **Q.**   What about any of the entities I mentioned yesterday in

15  court?  Did you go back to see if any of them traded?

16  **A.**   No.

17  **Q.**   Now, in your discussion with -- with Mr. Lazerus about the

18  SK Global deal, you were talking specifically -- it sounded

19  like you were talking specifically about Mr. Destler and

20  whether you could get this information from Mr. Destler.  Do

21  you recall that?

22  **A.**   Yes.

23  **Q.**   And isn't it true that one of the things Mr. Lazerus said

24  to you was, "I'll get him talking about Opti-Harvest"?  Do you

25  recall that?

 1  **A.**    I do recall him, at one point, mentioning something to the

 2  effect of "I'll get him talking about Loop because he'll think

 3  it's good for Opti-Harvest," or he made some kind of connection

 4  like that.

 5  **Q.**    And the idea was you're brainstorming, essentially, on how

 6  to get Mr. Destler to give up this information; correct?

 7  **A.**    I was asking if he had more information.  He was

 8  brainstorming how he could get it, is how I took it.

 9  **Q.**    Fair enough.

10       And so it did not appear to you, then, that it was

11  something that Mr. Destler was just going to give over?

12  **A.**    No.  I don't -- that was not my impression from the

13  numerous calls because he had made other remarks like, "If the

14  stock price goes down, they call me.  I'm supposed to get

15  buyers to help the stock go up."

16       And it became clear over time he wasn't talking to

17  Danny Solomita directly.  He was talking to Destler, who had an

18  obligation to the company.  So I -- I took it like, when it was

19  for the group's good, Destler might provide the information.

20  **Q.**    Okay.  So I asked a slightly different question.

21  **A.**    Okay.  I apologize.

22  **Q.**    I'm talking about -- it's okay.  I'm talking specifically

23  about SK Global.

24  **A.**    Okay.

25  **Q.**    And in that conversation that you had with Mr. Lazerus --

1  **A.**    Okay.

2  **Q.**    -- Mr. Lazerus -- did it appear to you that Mr. Lazerus

3  was thinking out loud about how he could get this information

4  from Mr. Destler?

5  **A.**    Yes, he did.

6  **Q.**    And, in fact, he was going to mislead Mr. Destler so that

7  he would provide him this information?

8  **A.**    There's at least twice I remember him seeming like he was

9  going to mislead him to get more information.

10 **Q.**    Now, he also told you that he was getting information from

11 Mr. Solomita -- correct? -- directly?

12 **A.**    It sounded like that was in the past, but yes.  At some

13 point, he was getting -- you mean Lazerus?  I don't know

14 whether he used Lazerus to get information from Solomita --

15 **Q.**    Yeah.  I apologize.

16 **A.**    I understood, at some point, they had been talking, and

17 then it sounded like that had -- the direct communication had

18 ceased.

19 **Q.**    But, in fact, in July of 2020, you believed Mr. Lazerus --

20 well, Mr. Lazerus told you he was getting information directly

21 from Danny Solomita?

22 **A.**    He was inconsistent on that point.

23 **Q.**    Do you know what tolls are?

24 **A.**    Yes.

25 **Q.**    What -- tolls are -- go ahead and explain tolls.

1    **A.**   They're telephone records that will show us to and from on

2    calls or texts.

3    **Q.**   And do you know who a Trevor Donelan is?

4    **A.**   Yes.

5    **Q.**   He works at the SEC; correct?

6    **A.**   He used to, yes, sir.

7    **Q.**   And in 20- -- on June 30th, 2020, you asked Mr. Don- --

8    Donelan if he had fresh telephone tolls for Lazerus.  Do you

9    recall that?

10   **A.**   Not the day, but I recall asking because we knew the SEC

11   was getting toll records.

12   **Q.**   Okay.  And you also said to Mr. Donelan, quote, "He says

13   he's in fairly consistent contact with Solomita, including" --

14          **MS. HALL:**  I'll object as to hearsay, Your Honor.

15          **THE COURT:**  Sustained.

16   **BY MR. YOUNG:**

17   **Q.**   Did you ask the SEC for tolls in 2020?

18   **A.**   Probably.

19   **Q.**   And was that because Mr. Lazerus told you he was still

20   getting information?

21          **MS. HALL:**  I'll object as to irrelevant.

22          **THE COURT:**  I will allow it in only for the purpose of

23   why and to explain this witness's conduct.  So it's not being

24   admitted for the truth of the matter.  It's only being admitted

25   to explain why he asked the SEC for tolls in 2020.

1        THE WITNESS:  I think I still have the question in

2   mind.

3        I asked for tolls, one, because the tolls we had were

4   outdated.  So we hoped, if they were getting refreshed tolls,

5   to get them.  But I also was hearing different things from

6   Mr. Lazerus about talking to Solomita directly or -- "Not

7   anymore.  I go through someone else."

8        And so tolls might help us know, are they talking

9   directly, although tolls here are of limited use because, if

10  they're speaking on WhatsApp, which they often were, that won't

11  be reflected in cell phone tolls.  So it was not going to

12  really tell me the whole story.

13  BY MR. YOUNG:

14  Q.   You just mentioned WhatsApp.  Do you use WhatsApp?

15  A.   Only in an undercover role, and then overseas I've used

16  WhatsApp.

17  Q.   So FBI agents talk to each other overseas using WhatsApp;

18  correct?

19  A.   I don't know.  There's certain countries I go to where

20  they only seem to use WhatsApp, and so I use it in that

21  country.

22  Q.   It's fair to say that, when you're overseas with other FBI

23  agents, using WhatsApp, you're not committing crimes?

24  A.   I'm not committing crimes overseas.

25                    (Laughter.)

1  BY MR. YOUNG:

2  **Q.**   And you're not using WhatsApp to conceal some crimes;

3  correct?

4  **A.**   I am not.

5  **Q.**   A lot of people use WhatsApp just to communicate; correct?

6  **A.**   Sure.

7  **Q.**   And most communications now are encrypted, aren't they?

8  **A.**   I would have no way of knowing most, but a lot of

9  communications are encrypted.

10 **Q.**   Do you use an iPhone?

11 **A.**   I do.

12 **Q.**   Do you know iMessage is encrypted?

13 **A.**   I do.

14 **Q.**   Do you know banks use encryption to protect their data?

15 **A.**   Yes.

16 **Q.**   WhatsApp is encrypted?

17 **A.**   Yes.

18 **Q.**   There's many forms of communication now that are

19 encrypted; correct?

20 **A.**   Yes.

21 **Q.**   And many people use encryption just to protect themselves

22 from hackers and whatnot; correct?

23 **A.**   Absolutely, yes.

24 **Q.**   Including FBI agents when they're overseas?

25 **A.**   Yes.

```
 1              MR. YOUNG:  Thank you, Your Honor.  No further

 2   questions.

 3              THE COURT:  Mr. Hall?

 4              MR. HALL:  I have a few, Your Honor.

 5                        CROSS-EXAMINATION

 6   BY MR. HALL:

 7   Q.    Good afternoon, Agent Tarwater.

 8   A.    Good morning, sir.

 9   Q.    I believe you said that before you became an FBI agent,

10   you were an attorney and worked in securities litigation?

11   A.    I -- no, over at the securities side, not litigation.  I

12   was not cut out for that.

13   Q.    All right.  And -- but you are an attorney?

14   A.    Yes, sir.

15   Q.    And you have about 20 years of experience in investigating

16   securities crimes; correct?  Is that a fair statement?

17   A.    17 years, yes, sir.

18   Q.    Are you familiar with stock chat rooms, in your

19   experience?

20   A.    Yes.  Yes.

21   Q.    What's a stock chat room?

22   A.    That can come in many forms, but people -- interested

23   investors potentially can go to these chat rooms and talk about

24   different stocks or what they think is happening with the

25   stock, whether it's a good buy or bad buy.
```

1          So people can go to these rooms/forums -- they can be

2    about one stock or lots of stocks -- and talk about them.

3    Q.   And there are quite a few of these chat rooms on the

4    Internet; correct?

5    A.   Oh, many, many of them.

6    Q.   One of them will be Yahoo Finance Forum; right?

7    A.   Yes.  There's posts within Yahoo Finance, yeah.

8    Q.   And have you heard of Stockopedia's investor discussion

9    forum?

10   A.   Say that name again, sir.

11   Q.   Stockopedia.

12   A.   Yes, I've heard of that.

13   Q.   How about Stockhouse.com?

14   A.   I'm not -- I'm not familiar with the name offhand, but --

15   Q.   Stockaholics.com [sic]?

16   A.   I'm not familiar with the name.  There are many, many.

17   Q.   Stocktwits.com?

18   A.   Not offhand.

19   Q.   Warrior Trading chat room?

20   A.   Not offhand.

21   Q.   BlackBoxStocks chat room?

22   A.   Not offhand, no, sir.

23   Q.   Have you ever tried to determine how many different chat

24   rooms there are available on the Internet for stocks?

25   A.   No.  I think that would be a difficult task.

1   **Q.**   In connection with this case, did you conduct any

2   investigation of chat rooms regarding what information was

3   available on the chat rooms regarding Loop?

4   **A.**   Depending on what you mean by "chat rooms."  I'm aware

5   that the SEC tried to do some -- they have, like, a scraping

6   tool to try to see if they could pick up posts about things,

7   but --

8   **Q.**   But did -- but did you -- as the co-case agent, you did

9   not try to access them?

10  **A.**   I did not, no, sir.

11  **Q.**   But you have accessed them in the past; correct?

12  **A.**   From time to time, when the investigation led us to a chat

13  room, yes, sir.

14  **Q.**   Right.

15       And that's how you know of their existence; right?

16  **A.**   Yes, sir.

17  **Q.**   In the course of your investigation, did you determine how

18  many different investors there were in Loop?

19  **A.**   Well, the SEC filings for Loop would list the number of

20  shareholders, and that obviously changed over time.  Are you

21  looking for a specific --

22  **Q.**   Ballpark -- ballpark number of how many people you think

23  invested in Loop in the time of this conspiracy.  So the

24  conspiracy's October 2014 through February -- what is it? --

25  3rd or 2nd of 2022, those dates.  Do you have any idea how many

1  people invested in Loop during that time frame?

2  **A.**  Not a specific number.  It changed a lot over the period.

3  **Q.**  Do you know how many -- we were talking earlier about this

4  letter that was sent out to -- to potential victims.  Do you

5  know how many of those letters were sent out?

6  **A.**  Perhaps 50.  I mean, that's a rough guess, but it wasn't

7  in the thousands --

8  **Q.**  All right.  And --

9  **A.**  I think under a hundred.

10 **Q.**  And your best guess, though -- you've looked at the blue

11 sheets regarding the stock that was traded in connection with

12 this case; right?

13 **A.**  Mostly summaries, but in some cases, the actual blue

14 sheets, yes, sir.

15 **Q.**  All right.  And that blue sheet would have names of -- of

16 investors; correct?

17 **A.**  Yes.

18 **Q.**  All right.  And do you have any idea how many people

19 invested based upon your review of the blue sheets?

20 **A.**  I couldn't give you a number.  I apologize.

21 **Q.**  More than a hundred?

22 **A.**  At some point in time, yes.

23 **Q.**  You're aware that, in connection with this case -- that we

24 exchanged -- the defense and the Government exchanged witness

25 lists for the trial; correct?

```
 1   A.   Yes.
 2   Q.   All right.  And did the prosecutors disclose with you the
 3   names of some of the witnesses that the defense intends to call
 4   in this case?
 5   A.   Yes.
 6   Q.   All right.  And so are you familiar with the name
 7   Jeff McCarthy?
 8   A.   I -- I recall hearing the name on the list.
 9   Q.   All right.  Did you seek to interview him?
10   A.   I do not recall him being interviewed.
11   Q.   What about Chad Ruyle?  Do you recall that name?
12   A.   I'm familiar with the name.  It's in chats.
13   Q.   And did you seek to interview Chad Ruyle?
14   A.   I do not believe we interviewed him.  I can't say for
15   certain if we sought to, if one of the other agents had tried,
16   but I -- I think I would have heard that.  So, no, I don't
17   think we interviewed him.
18   Q.   Right, because they would have reported back to you, as
19   the co-case agent; right?
20   A.   Yeah.
21   Q.   What about the name Andrew Stupin?  Did you try to
22   interview him?
23   A.   That was a -- that would be a more difficult topic --
24   discussion for interview.
25   Q.   It's -- you're aware that Ventanas Capital was a
```

1  limited liability company; correct?

2  **A.**  Yes, sir.

3  **Q.**  And the documentation that was filed with the

4  Secretary of State listed Michelle Fiore as the managing member

5  or owner of Ventanas Capital, LLC; correct?

6  **A.**  Yeah.  Ms. Fiore, yes, sir.

7  **Q.**  Right.

8      And you're aware that in California, an LLC can be kind of

9  a flow-through entity, where the tax consequences go to that

10  owner; correct?

11  **A.**  Yes, sir.

12  **Q.**  All right.  In this case, did you make any effort to

13  acquire the tax returns for Ventanas Capital, LLC?

14  **A.**  Not that I recall, no, sir.

15  **Q.**  Did you make any effort to obtain the tax returns for

16  Michelle Fiore on an individual basis?

17  **A.**  I don't believe we did, no, sir.

18  **Q.**  All right.  You're aware that the accountant for

19  Ventanas Capital was somebody named Albert Yang; right?

20  **A.**  I think I saw some emails with that name.  So that sounds

21  right.

22  **Q.**  Did you seek to interview him?

23  **A.**  No, sir.

24  **Q.**  Did you try to get any documents from him?

25  **A.**  No, sir.

1  **Q.**   You -- in response to Mr. Young's questions, you talked

2  about a dba, that Touchstone Capital Advisors was kind of a

3  dba.  Do you remember that testimony?

4  **A.**   Yeah.  I can't speak for others.  It just seemed to be

5  used in that manner.

6  **Q.**   All right.  Your -- in your experience as an FBI agent,

7  you're aware that, to do a dba -- that a business license is

8  required; correct?

9  **A.**   If they did it properly, yes.

10  **Q.**   All right.  And it's filed with the State or even with

11  local governments; correct?

12  **A.**   That's my understanding, yes, sir.

13  **Q.**   All right.  Did you conduct any research regarding

14  Touchstone Capital Advisors to determine whether any dba

15  statement had ever been filed?

16  **A.**   We had FBI support -- support employees try to look up

17  that information.  So I didn't personally.

18  **Q.**   And so when they -- so when they looked for that

19  information, did they uncover any Touchstone Capital Advisors

20  dba?

21  **A.**   I assume not because I think I would have seen it.  So --

22  **Q.**   In your undercover meetings in that period of time -- and

23  I believe we've heard a clip yesterday -- Mr. Lazerus expressed

24  the words -- and I think he said that there was a falling-out

25  between Mr. Danks and Mr. Solomita.  Do you recall that?

```
 1   A.    I do recall that.

 2   Q.    Did he elaborate in detail what that falling-out was?

 3   A.    He -- he gave some detail, and then he gave some detail to

 4   us in our official interview of him.  I've heard a few

 5   different versions of what happened in that apparent

 6   falling-out.  There's some chats about it with Mr. Destler.  So

 7   there's been many --

 8   Q.    I'm just talking about right now --

 9   A.    -- versions.

10   Q.    -- if I can focus you just on the undercover --

11   A.    Yes, sir.

12   Q.    -- the undercover conversations.

13   A.    He did give us some detail in that clip.

14   Q.    All right.  And -- and in that context, you were -- you

15   had the understanding that none of the information that was

16   being shared with you came from Mr. Danks; correct?

17   A.    During that undercover period?

18   Q.    Yes.

19   A.    About Loop?

20   Q.    Yes.

21   A.    I don't recall Mr. Lazerus saying information was coming

22   from Danks regarding Loop.

23   Q.    You were -- I'm going to switch topics again here.  A lot

24   of what I had has already been covered.  I don't want to

25   repeat.
```

```
 1        On September 27th, you went to Mr. Danks's residence;
 2   correct?
 3   A.   Of 2022, yes, sir.
 4   Q.   2022.  I forgot the year.
 5   A.   Yes, sir.
 6   Q.   So -- and that was -- at that time, you had a search
 7   warrant to retrieve Mr. Danks's cell phone data; correct?
 8   A.   Yes, sir.
 9   Q.   All right.  And Agent Patterson was the affiant, or the
10   person that wrote out the affidavit to support that search
11   warrant; correct?
12   A.   I believe that's right.
13   Q.   All right.  And in that -- prior to him writing that out,
14   did -- did you and he discuss what you would be trying to
15   obtain with the search warrant?
16   A.   The cell phone.
17   Q.   Did you have any discussion about obtaining Mr. Danks's
18   laptop?
19   A.   I'm not -- I don't recall a discussion with
20   Agent Patterson about that before.
21   Q.   The search warrant didn't authorize the seizure of his
22   laptop; correct?
23   A.   Not to my memory, no, sir.
24   Q.   All right.  And you didn't -- and at any time, you never
25   searched Mr. Danks's laptop?
```

1   **A.**   I don't recall us searching his laptop, no, sir.

2   **Q.**   What about the house, for documentary evidence?  When you

3   executed that search warrant, were you looking for documentary

4   evidence as well?

5   **A.**   I don't recall that in the scope of the search warrant,

6   no, sir.

7   **Q.**   At the time of that interview, you were aware that

8   Mr. Danks had been -- or was represented by counsel; correct?

9   **A.**   Yes, I believe that's right.

10  **Q.**   And you actually wrote a report regarding the execution of

11  that search warrant; right?

12  **A.**   I think another agent wrote the report of it.  I think I

13  wrote a report about some conversations because I was standing

14  with Mr. Danks.

15  **Q.**   If you're -- let me -- sometimes 302s have two agents'

16  names on them; right?

17  **A.**   Yes, sir.

18  **Q.**   And 302 is the formal FBI report of some action; right?

19  **A.**   Yes, sir.

20  **Q.**   And sometimes the person's name is in capital letters, and

21  sometimes it's not in capital letters.  Is that of some

22  significance?

23  **A.**   I believe if it's in -- my brain keeps going back to the

24  old way it worked.  But I believe if it's in all caps, that's

25  the person who started the draft in the system.  If there are

1    two names, that means both had to review it, and both had to

2    agree with the contents and then signed it electronically.

3    Q.   And do you recall that your name was in capital letters on

4    the 302 regarding the search on September 22nd, 2022?

5    A.   I don't, but I -- I'll take your word for it.

6    Q.   Well, on that date, there was -- there was no criminal

7    action pending; correct?  There was -- no complaint had been

8    filed?  No indictment had been returned?  Criminal charges had

9    not been filed against Mr. Danks; right?

10   A.   No.  That's correct.

11   Q.   And so the representation that you were aware of -- it was

12   a different attorney.  It wasn't me; correct?

13   A.   That's my memory, yes, sir.

14   Q.   It was an Aaron May.  Do you remember that name?

15   A.   I don't know if it was Aaron May or if it's because the

16   SEC had been seeking documents, and so we were aware there was

17   an attorney assisting Mr. Danks.  And so we don't interview

18   represented parties without their attorney.

19   Q.   Let me ask you some questions about that.

20        So you were aware that the SEC had initiated a document

21   request and had served Mr. Danks through his counsel; correct?

22   A.   I was aware of that, yes, sir.

23   Q.   And you were also aware that the SEC had issued document

24   requests for Ventanas to Michelle Fiore; correct?

25   A.   That sounds correct.

1    Q.   And I don't know if this is in evidence.  Maybe I missed

2    this.

3        Do you recall what day the indictment was returned in this

4    case?

5    A.   I believe it was November 22nd, 2022, on or about.

6            MR. HALL:  Can I please have one moment, Your Honor.

7            THE COURT:  Sure.

8    BY MR. HALL:

9    Q.   At the -- one last area, Agent Tarwater.

10       At the time that you were executing the search warrant,

11   you did not seek to interview Mr. Danks; correct?

12   A.   No.  In fact, we said, "We don't want to talk to you.

13   Don't make any statements.  We know you're represented."

14   Q.   I understand.

15       And -- and you have rules about when someone is

16   represented; correct?

17   A.   Yes, sir.

18   Q.   All right.  However, since that time, before the

19   indictment, you were aware that Mr. Danks was never interviewed

20   about what had happened with Loop; correct?

21   A.   By the FBI?

22   Q.   Correct.

23   A.   No.  We've never interviewed Mr. Danks.

24   Q.   Thank you very much.

25           THE COURT:  Before we turn it over to the Government,

```
 1   I understand, Ms. Hall, you wanted to reopen your cross.  You
 2   had a couple of additional questions.
 3            MS. HALL:  Yes.  I would appreciate that, Your Honor.
 4            THE COURT:  Okay.  Go ahead.
 5            MS. HALL:  Would you like me to follow up with
 6   additional questions with regard -- that the --
 7            THE COURT:  Any questions that you have.  You said you
 8   had additional questions.
 9            MS. HALL:  Thank you.
10       Let's start with 5242.  Give me a second.
11                    FURTHER CROSS-EXAMINATION
12   BY MS. HALL:
13   Q.   Good morning, Agent Tarwater.
14   A.   Good morning, ma'am.
15   Q.   I'm going to follow up with some of the questions by
16   Mr. Young with regard to the conversations you were having with
17   Mr. Lazerus in May of 2021 regarding talking to Jon Destler.
18       Are we oriented?
19   A.   Yes.  Thank you for that.
20   Q.   Thank you very much.
21       Okay.  So this was May of 2021, which is about a year and
22   three months after you began your targeting of Mr. Lazerus;
23   correct?
24   A.   It was -- it started in February 2020 that we first made
25   contact.
```

1   **Q.**   Yeah.

2        So you're agreeing with me that the May 2021 conversations

3   were a year and three months later?

4   **A.**   Yes.

5   **Q.**   Thank you.

6        And you were asked several questions about Mr. Lazerus

7   trying to get information out of Jon and possibly trick Jon

8   into giving information?

9   **A.**   Yes.

10  **Q.**   You also were inquiring of Lazerus with regard to whether

11  or not Jon gets weird when he asks him questions.  Do you

12  recall that?

13  **A.**   Words to that effect, yes, ma'am.

14  **Q.**   Okay.  And Mr. Lazerus did not say, "Oh, no.  He does this

15  all the time," did he?

16  **A.**   I don't think that was his response to that question,

17  ma'am.

18        (Defendants' Exhibit 3259B marked for identification.)

19        **MS. HALL:**  In fact, if we could play Defense

20  Exhibit 3259B, as in "boy" --

21        **THE CLERK:**  Is that already in?  Martha?

22        **MS. HALL:**  -- which has been stipulated to as -- to --

23        **THE COURT:**  Yes.

24        **MS. HALL:**  -- its admissibility.

25        **THE COURT:**  It may be admitted.

TARWATER - FURTHER CROSS / HALL

```
 1            (Defendants' Exhibit 3259B received in evidence.)

 2            THE COURT:  You're playing the entire clip?

 3            MS. HALL:  25 seconds.

 4            THE COURT:  Okay.

 5            PARALEGAL:  3259B?

 6            THE COURT:  3259B.

 7            MS. HALL:  Is it -- do we not have a timestamp on it?

 8            (Audio was played but not reported.)

 9  BY MS. HALL:

10  Q.   So the response from Mr. Lazerus was, "I" -- "I'll find

11  out"; is that right?

12  A.   That's what he said, yes, ma'am.

13  Q.   "I will find out" being a future tense?

14  A.   It says what it says, ma'am.

15  Q.   Thank you.

16       Now, you don't have any -- or you don't have any personal

17  knowledge of the actual conversation between Jon and -- and

18  Robert, Jon Destler and Robert Lazerus; right?

19  A.   With one exception, when I was sitting next to Lazerus

20  when he called Jonathan Destler.

21  Q.   Right.

22       Following this conversation, you don't have any personal

23  knowledge of the conversation between Jon Destler and

24  Robert Lazerus; correct?

25  A.   I do not.
```

1   Q.   So you don't know what Robert said to Jon; right?

2   A.   After this conversation, no, ma'am.

3   Q.   And you don't know what, if anything, Jon said to Robert?

4   A.   Not after this conversation, no, ma'am.

5   Q.   In fact, it could be that Jon was not the source of any

6   information about the SK deal?

7   A.   If Mr. Lazerus was misrepresenting that, but he -- he

8   said, "Jon told me this," and then --

9   Q.   But as far as your personal knowledge, you can't confirm

10  that personally?

11  A.   No.  He could have been misrepresenting.

12  Q.   You -- right.

13       You don't have any investigation that would confirm that?

14  A.   Not for this event, no, ma'am.

15  Q.   I'd like to go back to the issue of the money.

16       MS. HALL:  And these are very short clips, Your Honor.

17  BY MS. HALL:

18  Q.   On December 4th, 2020, you paid Robert Lazerus $4,150;

19  right?

20  A.   That sounds right.

21       MS. HALL:  And could we play Defense Exhibit 3251, the

22  32 seconds?

23            (Audio was played but not reported.)

24  BY MS. HALL:

25  Q.   So that's a tape of you paying -- actually giving the

1    money to Robert Lazerus; is that right?

2    **A.**   Right, in exchange for the inside information.

3    **Q.**   So he did not ask for the money; correct?

4    **A.**   He asked for 10 percent of the profits.

5    **Q.**   I'm asking -- my question is:  He never said to you, "Hey,

6    Jay, do you have any money for me?"

7    **A.**   He never said, "Hey, Jay, do you have any money for me?"

8    **Q.**   He never asked for payment of that commission?

9    **A.**   No.  I don't think he came out and asked me for payment.

10   **Q.**   You gave him the money without prompting from him?

11   **A.**   In this instance, yes.  Yep.

12   **Q.**   That was December 4th, 2020, the first year of the

13   investigation; right?

14   **A.**   Yes.

15   **Q.**   And then in May of 2021, you told him you wanted to

16   increase his commission to 20 percent?

17   **A.**   I can't remember the date, but I do recall saying we could

18   go to 20 percent.

19            **MS. HALL:**  And can we play Defense Exhibit 3259C?

20            **THE CLERK:**  Is that one in?

21            **THE COURT:**  That's in.

22            **THE CLERK:**  It's in?

23              (Audio was played but not reported.)

24   BY MS. HALL:

25   **Q.**   Going to December the 9th of 2021, that's almost -- almost

1   two years after the initial contact; is that right?

2   **A.**   Close, yes, ma'am.

3   **Q.**   All right.  And, again, you brought cash to

4   Robert Lazerus?

5   **A.**   I did, yes, ma'am.

6   **Q.**   All right.  And, again, it was without prompting from him?

7   **A.**   Correct.

8            **MS. HALL:**  Can we play Defense Exhibit 3190?

9            **THE COURT:**  You may.

10           (Audio was played but not reported.)

11           **MS. HALL:**  And, Your Honor, just to make sure that

12   those defense exhibits -- 3251, 3259C, and 3190 -- are

13   admitted.

14           **THE COURT:**  Yes.

15   **BY MS. HALL:**

16   **Q.**   Moving on to a different topic, Agent Tarwater, you

17   were -- you were asked several questions by Mr. Young about the

18   letter that was sent out in the spring of 2024 to Loop

19   investors; is that right?  You recall -- you recall those

20   questions?

21   **A.**   Yes, ma'am, I do.

22   **Q.**   And in response to those questions, you said to Mr. Young

23   that, you know, some investors wouldn't talk to you, and some

24   investors responded; is that right?

25   **A.**   Correct.

1    **Q.**   Do you recall an investor named Holly Manion?

2    **A.**   I do.

3    **Q.**   And she's an investor who did not represent herself as a

4    victim; right?

5    **A.**   I'm trying to recall all the different 302s in my head,

6    but I -- I don't think she represented herself as a victim.

7    **Q.**   And, in fact, she represented herself as someone who had

8    made money on Loop?

9             **MS. CHOPRA:**  Objection.  Hearsay.

10            **THE COURT:**  Sustained.

11   **BY MS. HALL:**

12   **Q.**   She indicated that -- well, you became aware that she knew

13   Mr. Lazerus; is that right?

14   **A.**   I think she said they were close friends, yes.

15   **Q.**   All right.  And I believe you said she did not represent

16   herself as a victim?

17            **MS. CHOPRA:**  Objection.  Hearsay.

18            **THE COURT:**  Sustained.

19   **BY MS. HALL:**

20   **Q.**   Let's go to the questions about Daniel Solomita coming and

21   going into the United States.

22        You're aware that, in the spring of 2024, there was a

23   Roth Capital conference in -- is it Laguna Niguel or Laguna --

24   one of the Lagunas in Orange County, one of the fancy Lagunas

25   in Orange County.

1          Are you aware of that Roth conference?

2     **A.**    I'm -- I'm aware that it's typically held there every

3     year.  So that wouldn't surprise me.

4     **Q.**    Well, are you also aware that Loop Industries had a

5     presence at that conference?

6     **A.**    I know they've been to the conference before.

7     **Q.**    All right.  So just so the jury knows what we're talking

8     about, can you explain what the Roth Capital conference is?

9     **A.**    Roth Capital holds a conference, and they -- among other

10    things, they bring sort of companies together with people that

11    might be interested in learning about the companies and

12    investing, and there's presentations and things of that sort.

13    **Q.**    Okay.  So Roth Capital puts together the people who have

14    money with the companies who need money or want money?

15    **A.**    I don't think that's how the brochure reads, but that's a

16    fair -- that's a fair example of what they're doing.

17    **Q.**    The investors who are present are generally, I guess, what

18    we would call high-end investors?  Institutional investors?

19    Investors with a lot of money?

20    **A.**    That would be my guess.

21    **Q.**    Okay.  Have you ever been --

22    **A.**    Or they're in the industry in some way to -- they're all

23    there networking, among other things.  So --

24    **Q.**    And you said that you're aware that Loop had -- had a

25    presence at previous Roth Capital conferences?

1   **A.**   I remember seeing a press release where they said they

2   were attending.  I can't remember the -- the dates.

3   **Q.**   You're not sure if it was in spring of 2024 that they were

4   also there?

5   **A.**   Not sitting here, no, ma'am.

6   **Q.**   Okay.  You were talking about encryption with Mr. Young

7   and all the various different types of encryption there are,

8   and I believe you were also here during the testimony of

9   Steve Bajic; is that right?

10  **A.**   Yes, ma'am.

11  **Q.**   And you remember him talking about encrypted email; right?

12  **A.**   Yes.

13  **Q.**   Okay.  Robert Lazerus used Gmail when he communicated with

14  you; is that right?

15  **A.**   Correct.

16  **Q.**   You were also talking about all the various stock chat

17  rooms that are available for information about various

18  companies and stocks -- by Mr. Young; right?

19  **A.**   Yes.

20  **Q.**   Are you also familiar with the Reddit chat room about

21  stocks?

22  **A.**   I'm familiar there are chat rooms in Reddit.

23  **Q.**   One of them is called "wallstreetbets"?

24  **A.**   I'm not familiar with that one.

25  **Q.**   So we've talked, and you've heard -- or, actually, you

1  have introduced a fair number of exhibits where short selling

2  is the topic; is that right?

3  **A.**   Many times, some of the chats refer to short selling.

4  Yes, ma'am.

5  **Q.**   Right, especially the chats from Mr. Danks talking about

6  getting killed by the shorts or having a lot of short selling

7  happening?

8  **A.**   I certainly remember Mr. Danks talking about shorters,

9  yes.

10  **Q.**   All right.  And the import of that is that when the

11  shorters come in, there's downward pressure on the stock price?

12  **A.**   That can certainly happen, yes, ma'am.

13  **Q.**   So you could be looking at a situation where the stock

14  price is plummeting?

15  **A.**   Potentially.

16  **Q.**   And you're aware of the fact that there are investigations

17  of short sellers as well?

18  **A.**   You mean have there been investigations?

19  **Q.**   For criminal -- yes.

20  **A.**   Oh.  Yes.  Yes.

21  **Q.**   You know -- as an FBI agent, you know that short sellers

22  are investigated for securities fraud?

23  **A.**   I'm aware of some instances where short shellers were

24  investigated, yes, ma'am.

25  **Q.**   And, in fact, you know --

 1          **THE COURT:**  I'm going to interrupt you for a minute

 2    because my understanding was you just had requested to reopen

 3    to introduce a few exhibits into evidence that you had missed

 4    yesterday.  I wasn't aware we were going to do a whole new

 5    cross-examination.

 6        So did you have other exhibits that you wanted to -- that

 7    you had missed yesterday and just wanted to request --

 8          **MS. HALL:**  No, no other exhibit -- no other exhibit --

 9    no other exhibits that I missed, Your Honor.

10          **THE COURT:**  Okay.  I think that you did your

11    cross-examination.

12          **MS. HALL:**  Okay.

13          **THE COURT:**  So it's the Government's turn to do a

14    redirect.

15          **MS. HALL:**  Thank you, Your Honor.

16          **THE COURT:**  Thank you.

17          **MS. CHOPRA:**  Give me one second, please.

18                    <u>**REDIRECT EXAMINATION**</u>

19    BY MS. CHOPRA:

20    **Q.**    Agent Tarwater --

21    **A.**    Yes, ma'am.

22    **Q.**    -- during your cross-examination, you discussed the

23    payments during the undercover operation quite a bit.  Do you

24    recall that?

25    **A.**    Yes, ma'am.

1  **Q.**   And just to clarify, in your conversations with

2  Mr. Lazerus, did you first bring up, in some initial

3  conversation, some offer of payment?

4  **A.**   Did I first bring up an offer of payment?

5  **Q.**   Yes.

6  **A.**   Explicitly, I'm the first one that brought up, "How does

7  this work?  What's the arrangement?  How do you get taken care

8  of?  Is it in a document, or do I pay you a fee?"

9  **Q.**   You're trying to figure out what the arrangement would be?

10 **A.**   Correct.

11 **Q.**   But you didn't offer a set amount during that initial

12 conversation, did you?

13         **MS. HALL:**  I'll object as to leading.

14         **THE COURT:**  Sustained.

15 BY MS. CHOPRA:

16 **Q.**   Did you offer a set amount during that initial

17 conversation?

18 **A.**   No.  Actually, I didn't even indicate what the arrangement

19 would be based on.  I just said, "How's this work?  You tell

20 me."

21 **Q.**   And why did you ask that?

22 **A.**   Well, for instance, if he was an investment adviser, he

23 would have said, "Well, I take a fee to refer you to

24 companies."

25         **MS. HALL:**  Objection as to -- as to nonresponsive and

 1 | beyond -- beyond the scope of the question.

 2 |         **THE COURT:**  Overruled.

 3 |         **THE WITNESS:**  So he could have -- he could have

 4 | described a perfectly legal arrangement.  So I asked him, "How

 5 | does it work?  What's the arrangement?"  I even rec- -- even

 6 | said, "Is it in a document which, you know, would normally

 7 | document an illegal payment?"

 8 |     So I just put it out there to see what he would say.

 9 | **BY MS. CHOPRA:**

10 | **Q.**   Did you expect that he would possibly want money for the

11 | arrangement that was going to happen between you two?

12 | **A.**   At the time I asked that question, he told me five times

13 | he has material nonpublic information.  And one of those times,

14 | I said, "Oh, that's interesting.  Sounds like something's

15 | coming."

16 |     And he said, "But I can't talk about it."  And I took that

17 | as a cue of "I told you I have it.  It's your turn to tell me

18 | what you're going to do."

19 |         **MS. HALL:**  Objection.  Motion to strike.  Speculation.

20 |         **THE COURT:**  Overruled.

21 | **BY MS. CHOPRA:**

22 | **Q.**   And then later on, was there a conversation about

23 | Mr. Lazerus receiving about 10 percent as a commission?

24 | **A.**   He asked for 10 percent of the profits.

25 | **Q.**   That was my question.

1          So who asked for the 10 percent?

2    **A.**    He did.

3    **Q.**    You did not?

4    **A.**    No.  He -- he tied it to the trading.

5          (Court reporter requests clarification for the record.)

6               **THE WITNESS:**  To the trading.  Sorry, sir.

7    **BY MS. CHOPRA:**

8    **Q.**    And, eventually, did that lead to the payments that you

9    did make him down the road?

10   **A.**    Both payments were after he gave me information, and then

11   the information came out, and I pretended I had traded on it

12   and made a profit.

13   **Q.**    And at some point later in your conversations with him,

14   did you have a conversation about him receiving a similar

15   commission from other people that he did similar work for?

16   **A.**    He mentioned getting 10 to 20 percent.

17   **Q.**    For other work that he was doing?

18   **A.**    For finding investors.

19   **Q.**    Besides working with you?

20   **A.**    Yes.

21   **Q.**    During the cross-examination, Ms. Hall played a series of

22   clips for you from your conversations with Mr. Lazerus.  Do you

23   recall that?

24   **A.**    Yes, ma'am.

25   **Q.**    And one of the clips she played was Defense Exhibit 3191,

 1 | and do you recall the conversation on -- it was on May 20th of

 2 | 2021 -- that was that clip -- where you and Mr. Lazerus talked

 3 | about needing to solidify and tightening a little bit?

 4 | **A.**   Yes.

 5 | **Q.**   Do you recall whether there was more to that conversation

 6 | than was played in that clip subsequent to what was played?

 7 | **A.**   Yes.  Yes, there was certainly more.

 8 | **Q.**   Okay.  Do you recall that, subsequent to the clip that was

 9 | played, there was a conversation about draining Jon for

10 | everything?

11 | **A.**   I believe Mr. Lazerus used words to that effect.

12 | **Q.**   And was that on the May 20th, 2021, meeting?

13 | **A.**   Yes, ma'am, I believe so.

14 |         **MS. CHOPRA:**  Your Honor, we prepared a clip.  It's

15 | previously been disclosed to the defense as Exhibit 383, and

16 | I'd like to admit that into evidence.

17 |      (Government's Exhibit 383 marked for identification.)

18 |         **THE COURT:**  Any objection?

19 |         **MS. HALL:**  No.

20 |         **MR. YOUNG:**  No.

21 |         **MR. HALL:**  No, Your Honor.

22 |         **THE COURT:**  383 may be admitted and played.

23 |      (Government's Exhibit 383 received in evidence.)

24 |         **MS. CHOPRA:**  And I'm going to -- I'm going to have you

25 | stop it at a certain point.  So start from the beginning,

```
 1   please.
 2              (Audio was played but not reported.)
 3         MS. CHOPRA:  Can we stop it right --
 4   BY MS. CHOPRA:
 5   Q.   Is that the part that Ms. Hall played for you in
 6   Exhibit 3191?
 7   A.   I believe so, yes, ma'am.
 8         MS. CHOPRA:  Okay.  Can we play the rest of it,
 9   please.
10              (Audio was played but not reported.)
11   BY MS. CHOPRA:
12   Q.   So during the part of this conversation that was not
13   played in the defense exhibit, was there a conversation about
14   Seoul?
15   A.   Yes.
16   Q.   And did that relate to the SK Global deal that we've been
17   talking about?
18   A.   It did.
19   Q.   When was that deal announced?
20   A.   Approximately one month later.
21   Q.   After this conversation?
22   A.   After the conversation.
23   Q.   Turning to chats between Mr. Danks and Mr. Lazerus, do you
24   recall yesterday, during cross-examination, Ms. Hall showed you
25   a series of Government exhibits that just had texts by
```

TARWATER - REDIRECT / CHOPRA

1    Mr. Danks to Mr. Lazerus?

2    **A.**    An extraction of texts.  Yes, I do.

3    **Q.**    And she asked you if there were replies from Mr. Lazerus

4    to texts from Mr. Danks?

5    **A.**    She did.

6             **MS. CHOPRA:**  Okay.  Can we pull up Government

7    Exhibit 457, which is in evidence?

8    **BY MS. CHOPRA:**

9    **Q.**    Do you recall this text?

10   **A.**    Yes.

11   **Q.**    And is this -- is this one just from Mr. Danks to

12   Mr. Lazerus?

13   **A.**    Correct.

14   **Q.**    Do you know if this is a clip from a longer set of chats

15   between Mr. Danks and Mr. Lazerus?

16   **A.**    I believe this is a clip from a longer set, yes.

17   **Q.**    And do you know -- following this, are there replies from

18   Mr. Lazerus to Mr. Danks in the same longer-set chats?

19   **A.**    Yes, ma'am, I believe so.

20            **MS. CHOPRA:**  Your Honor, I'd like to pull up

21   Exhibit 808, which is not yet in evidence.  This is not yet in

22   evidence.

23        (Government's Exhibit 808 marked for identification.)

24   **BY MS. CHOPRA:**

25   **Q.**    On the first page of this, do you see that same chat that

TARWATER - REDIRECT / CHOPRA

```
 1   was 457?

 2   A.   Yes, ma'am.

 3          MS. CHOPRA:  Okay.  And then can we scroll down so he

 4   can see the remaining chats?

 5   BY MS. CHOPRA:

 6   Q.   Now, there's subsequent chats between Mr. Lazerus and

 7   Mr. Danks?

 8   A.   Yes, ma'am.

 9          MS. CHOPRA:  Your Honor, I'd like to admit 808 into

10   evidence.

11          MS. HALL:  No objection.

12          MR. HALL:  No objection.

13          THE COURT:  808 may be admitted.

14        (Government's Exhibit 808 received in evidence.)

15   BY MS. CHOPRA:

16   Q.   So in this -- in this exhibit, there is a reply from

17   Mr. Lazerus about Allan Brennan to Mr. Danks; is that right?

18   A.   Yes.

19          MS. CHOPRA:  You can take that down.

20        Thank you.

21   BY MS. CHOPRA:

22   Q.   On cross-examination, there was significant discussion

23   about a victim letter that was sent out by the FBI.  Do you

24   recall that?

25   A.   A potential victim letter, yes, ma'am.
```

TARWATER - REDIRECT / CHOPRA

1  **Q.**   Yes.

2      What's the reason the FBI sent out a potential victim

3  letter?

4  **A.**   To identify other potential victims.

5  **Q.**   And as an FBI agent, do you have any duty to find

6  potential victims of the crimes that you're investigating?

7  **A.**   Absolutely.

8  **Q.**   What kind of duty is that?

9  **A.**   I mean, victims have numerous enumerated rights.  They

10 need to know a criminal action is happening, and they have --

11 hopefully, if we can get money back, they get restitution

12 rights from the defendants if they're convicted.

13 **Q.**   So you try and make a potential --

14      **MS. HALL:**  Objection as to leading.

15 **BY MS. CHOPRA:**

16 **Q.**   You try to make a potential victim whole?

17      **MS. HALL:**  Objection.  Leading.

18      **THE COURT:**  Sustained.

19 **BY MS. CHOPRA:**

20 **Q.**   And before you sent out the letter to these potential

21 victims, did you try contacting individuals who could have been

22 victims in other ways?

23 **A.**   People were interviewed before the letters went out, yes.

24 **Q.**   And so then after these interviews were attempted, what

25 was the reason the FBI also decided to send out a letter?

1    **A.**    One of the reasons was, speaking with the prosecutors,

2    they said, "We want to talk to other victims."  In these kinds

3    of cases, people -- in these types of investigations, not

4    necessarily these cases, these types of investigations, people

5    might not know they're part of the scheme because of the

6    concealment aspect.

7        So it's not like they've been robbed on the street and

8    they know.  They -- sometimes they have to be notified so we

9    can ask questions, and then they believe they're a victim or

10   they don't, but --

11   **Q.**    And you also described, at least with regard to one person

12   that was brought up on cross, Andrew -- Andrew Stupin, that it

13   would have been more difficult potentially to interview him.

14   Why?

15   **A.**    Early on, based on information we had, there was some

16   evidence that he was part of manipulative trading in the stock.

17   And so we didn't -- it wouldn't be just simply, "Let's go

18   interview him as a potential victim."  He might -- he might be

19   more of a subject kind of interview, which changes the

20   calculus.

21   **Q.**    Do you come -- do you come across that issue regularly in

22   these types of cases that you investigate?

23   **A.**    Yes, we do.

24   **Q.**    And can you describe that further?

25   **A.**    It can be hard to tell who's sort of part of the scheme,

1    sometimes even unwittingly, or who's just a completely innocent

2    investor, and it takes a lot of investigation to figure out

3    maybe where they go.  Sometimes they're in the middle.  It can

4    be difficult.

5    **Q.**   And does that play into individuals wanting to or not

6    wanting to talk to the FBI --

7              **MR. YOUNG:**  Objection.  Foundation.

8    **BY MS. CHOPRA:**

9    **Q.**   -- with regards to these cases?

10             **MR. YOUNG:**  Objection.  Foundation.

11             **THE COURT:**  Overruled.

12             **THE WITNESS:**  Yes.  In investigations like this,

13   personal relationships have been built, which makes it

14   difficult sometimes for people to want to talk to you.

15   **BY MS. CHOPRA:**

16   **Q.**   When you say "personal relationships," what do you mean?

17   **A.**   A lot of the defendants in this matter had close personal

18   relationships with a lot of the investors that they had

19   acquired over time, and that can be difficult to have someone

20   talk to you when they think you're talking about their friend.

21   **Q.**   Could it also be difficult to have someone talk to you if

22   they think they're liable in the scheme that you're

23   investigating?

24             **MS. HALL:**  Objection.  Leading.

25             **THE COURT:**  Sustained.

1    BY MS. CHOPRA:

2    **Q.**    Is there some liability component that plays into whether

3    it's hard or not hard to interview somebody?

4    **A.**    Yes.  And in this matter, since the Government's theory

5    was that some people got bits and pieces of inside information,

6    they were reluctant to speak to us.  Some spoke to us and then

7    later simply realized they shouldn't have said these things.

8             **MS. HALL:**  Objection.  Speculation as to --

9             **THE COURT:**  Sustained.

10            **MS. HALL:**  Motion to strike that portion of the

11   response.

12            **THE COURT:**  That response as to what they might or

13   might not have realized after the fact is sustained -- is

14   stricken.

15   **BY MS. CHOPRA:**

16   **Q.**    On the topic of interviewing -- interviewing individuals,

17   on direct, you tried to articulate why the FBI did not

18   interview Allan Brennan.  Do you recall that?

19   **A.**    Yes, ma'am.

20   **Q.**    And just to clarify the record, you never asked him to

21   submit to an interview; right?

22   **A.**    Correct.

23   **Q.**    Was there anything you had learned, during your

24   investigation, about the relationship between Mr. Allan Brennan

25   and Mr. Lazerus that caused -- that caused the FBI not to

1  interview Allan Brennan?

2  **A.**   Yes.

3          **MR. YOUNG:**  Objection.  Cumulative.

4          **THE COURT:**  Overruled.

5  **BY MS. CHOPRA:**

6  **Q.**   What?

7          **MS. HALL:**  I'll object as to -- based on hearsay and

8  speculation.

9          **THE COURT:**  Overruled.  Overruled.

10         **THE WITNESS:**  Approximately a week later, I think I

11  testified we spoke to Allan Brennan's son and financial

12  adviser, and both expressed that Allan Brennan appeared to

13  be -- I don't want to say under the control of Robert Lazerus

14  but heavily influenced by Robert Lazerus --

15         **MS. HALL:**  I'll object to "appear to be" and move to

16  strike.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  -- and that Allan Brennan wasn't

19  listening to their advice.

20     And so that gave us concern that if we tried to

21  interview -- it's part of why we just showed up at

22  Allan Brennan's house.  We thought if we called him to set up

23  an interview, he would likely call Robert Lazerus and --

24         **MS. HALL:**  Objection as to what would likely happen.

25         **THE COURT:**  Overruled.  It's being admitted solely to

1   explain the agent's behavior.

2           **THE WITNESS:**  So we were concerned Allan Brennan might

3   not speak to us or might be infected somehow by Mr. Lazerus's

4   influence.  A big concern was Allan Brennan not losing more

5   money, but Gary Brennan was taking over the accounts.  So

6   that -- that told us we could wait.

7           **MS. HALL:**  I'll -- I'll object to -- as nonresponsive.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  So we didn't think we needed to

10  interview him right away to stop him from losing more money

11  because we thought his son was -- was going to get involved and

12  put a stop to that, and so that gave us time to -- to do other

13  investigative routes.

14  **BY MS. CHOPRA:**

15  **Q.**   So did you make a strategic decision, then, in this

16  investigation not --

17          **MS. HALL:**  Objection.  Leading.

18          **THE COURT:**  Sustained.

19  **BY MS. CHOPRA:**

20  **Q.**   Was that decision strategic, not to interview him?

21  **A.**   Yes, in consultation with the prosecutors, who made a

22  strategic decision to go -- to go a different direction.

23  **Q.**   And in terms of making strategic decisions about

24  interviews, on cross-exam- -- examination, you were asked about

25  whether you interviewed scores of different people?

TARWATER - RECROSS / YOUNG

1   A.    Yes, ma'am.

2   Q.    During the course of an investigation, as an FBI agent, do

3   you have to make strategic decisions on who to interview and

4   who not to interview?

5   A.    Yes, and we have limited resources.

6   Q.    That was my next question.

7         Is it possible to interview everyone you see amidst the

8   evidence that you gather?

9   A.    In a small Ponzi case, it might be.  In a large alleged

10  securities fraud, no.  It's impossible.  There's far too many

11  people involved.

12        **MS. CHOPRA:**  One second, Your Honor.

13        No further questions, Your Honor.

14        **THE COURT:**  Any recross?

15        **MR. YOUNG:**  Briefly.

16        **THE COURT:**  Okay.

17                     <u>RECROSS-EXAMINATION</u>

18  **BY MR. YOUNG:**

19  Q.    Special Agent Tarwater, you mentioned that you talked to

20  alleged or purported victims so that they can get recovery.  Do

21  you recall that?

22  A.    One purpose in identifying victims is so that hopefully

23  they can get recovery, yes.

24  Q.    And you'd agree with me that people lose money in the

25  stock market every day?

1    **A.**    Yes.

2    **Q.**    In legit -- totally legitimate transactions?

3    **A.**    In non-fraudulent transactions, yes, people lose money in

4    the stock market.

5    **Q.**    And as part of the -- the pitch to talk to you, did you

6    tell these witnesses that they could get their money back?

7    **A.**    I did not, no.

8    **Q.**    Did any of the agents tell them that?

9    **A.**    I can't tell you what they said if they were on a phone

10   call without me.

11   **Q.**    When you talked -- did you talk to any of the victims --

12   or alleged victims?

13   **A.**    Yes.

14   **Q.**    And did you tell them that there was a potential they

15   could get their money back?

16   **A.**    I recall -- I don't want to speculate.  I -- I believe one

17   of the victims asked that, and we described the process, that

18   there's the trial, and people are convicted at trial.  That's

19   one part of the criminal process.

20   **Q.**    And who was that?

21   **A.**    Again, I remember one of the victims asking.  I can't tell

22   you who.

23            **MR. YOUNG:**  No further questions.

24            **THE COURT:**  Anything further?

25            **MS. HALL:**  Just two matters.

<u>**RECROSS-EXAMINATION**</u>

**BY MS. HALL:**

**Q.**   Agent Tarwater, I just want to go back to Allan Brennan briefly.

      You have given us your basis for your strategic decision not to interview Allan Brennan; correct?

**A.**   Not to interview him at the beginning, yes, ma'am.  After the first failed attempt, yes, ma'am.

**Q.**   And that was based on conversations that you had with Gary Brennan and another individual; correct?

**A.**   And then conversations with the prosecutors, yes.

**Q.**   Okay.  And Gary Brennan made certain representations about what he thought was happening with his father and Mr. Lazerus; right?

**A.**   Correct.

**Q.**   All right.  But you don't have Allan Brennan's view of that; correct?

**A.**   Correct.

**Q.**   So you based it only on that one side, Gary Brennan's side; correct?

**A.**   Corroborated by Allan Brennan's financial adviser as well, yes, ma'am.

**Q.**   Two -- two individuals?

**A.**   Correct, and some other reporting.

**Q.**   Now, I want to take you to the chats.  We had a little

1    back-and-forth about response and no response.

2           MS. HALL:  And I would like to just pull up

3    Government's Exhibit -- and I'm going to ask my assistant,

4    Ms. Fox, to -- can you pull up Government's Exhibit 808 that

5    was introduced?  No.  I'm sorry.  468.  468.  Sorry about that.

6    468.

7         Is that 468?

8           PARALEGAL:  Yeah.  Uh-huh.

9           MS. HALL:  Great.

10        Can you scroll down?

11   BY MS. HALL:

12   Q.   And you see that that's Government's Exhibit 468,

13   Agent Tarwater?

14   A.   I -- I see the 468 tab, yes, ma'am.

15   Q.   That's right.

16        And if we scroll down, this is one of those that has no

17   response; is that right?

18           MS. HALL:  Scroll down, please.

19           THE WITNESS:  I only see one page on this exhibit.

20           MS. HALL:  Or zoom out.  Can you zoom out so we can

21   see the full page?  Is there another page to this?

22        Okay.  So we can't scroll down.  So that's the only page.

23        I'm going to ask my assistant to put up what was marked as

24   3007.

25        Is that right?

```
1              PARALEGAL:  3008.

2              MS. HALL:  3008.

3   BY MS. HALL:

4   Q.   Which you identified just yesterday as the full extraction

5   report of the text messages between Don Danks and

6   Robert Lazerus, and I would ask you to go to Page 148.

7   A.   Just to clarify, that was --

8              THE COURT:  This is not in evidence.

9              THE CLERK:  Right.

10  BY MS. HALL:

11  Q.   I'm sorry?

12  A.   It was an extraction.

13  Q.   An extraction?

14  A.   Yeah.

15  Q.   Right.

16       Now, if we -- yes, this is not in evidence.

17       So I'm asking you just to refer to Page 148.  You can

18  compare because we have the dual screens up before -- in front

19  of you.  That appears to be -- we're showing, on

20  Defense Exhibit 3008, the same text message as on

21  Government Exhibit 468; is that right?

22  A.   I'm sorry.  One moment while I read it, ma'am.

23  Q.   Sure.

24  A.   Yes, I see the same chat on both sides you have there.

25             MS. HALL:  Okay.  So I will ask my assistant to scroll
```

 1  down.

 2  **BY MS. HALL:**

 3  **Q.**   Now, on the extraction report in Exhibit 3008 -- if you'll

 4  go back up, please -- we're seeing several messages from

 5  Don Danks to Robert Lazerus after the chat in

 6  Government Exhibit 468; is that correct?  Are you seeing that

 7  as well?

 8  **A.**   I see several more Danks responses and then a Lazerus

 9  response.

10  **Q.**   Okay.  So you have, like, four -- is it correct that there

11  are, like, four or five additional Danks chats to

12  Robert Lazerus after the one in Government Exhibit 468?

13  **A.**   I -- I can't count because it's -- it's --

14  **Q.**   It's going -- it's going too fast.

15  **A.**   But I saw numerous -- numerous Danks chats all in a row.

16  **Q.**   All in a row, unresponded to?

17  **A.**   In that row, yes, ma'am.

18  **Q.**   Yes.

19       So there are no green bubbles from Mr. Lazerus?

20  **A.**   Not in that little row you flashed by, right.

21  **Q.**   That's right.

22          **MS. HALL:**  Okay.  So, slower, can we go down to the

23  green bubble?

24  **BY MS. HALL:**

25  **Q.**   There, you have a green bubble, which is a chat from

1  Mr. Lazerus; right?

2  **A.**   Yes, ma'am.

3  **Q.**   Okay.  And do you -- can you see the date on that?

4  **A.**   Looks like February 15th, 2018.

5  **Q.**   And can you still see the date on Government's

6  Exhibit 468?

7  **A.**   February 7th, 2018.

8  **Q.**   So that would be about a week later?  Lazerus --

9  Mr. Lazerus finally responds?

10  **A.**   In this chat string?

11  **Q.**   In this chat string.

12  **A.**   Yes.  I can't say if he responded or not otherwise.

13       **MS. HALL:**  Nothing further, Your Honor.

14       **THE COURT:**  Anything further?

15       **MS. CHOPRA:**  I have one question, Your Honor.

16       **THE COURT:**  Okay.

17            **FURTHER REDIRECT EXAMINATION**

18  **BY MS. CHOPRA:**

19  **Q.**   Agent Tarwater, in that text message that we just saw that

20  Ms. Hall pulled up, does that reflect any phone calls

21  intervening between those text messages?

22  **A.**   No.

23  **Q.**   Could there have been phone calls?

24  **A.**   Yes, or --

25       **MR. YOUNG:**  Objection.  Speculation.

1          **THE COURT:**  Sustained.  Speculation.

2    **BY MS. CHOPRA:**

3    **Q.**   Were there phone calls between Mr. Danks and Mr. Lazerus

4    on the phone that you guys obtained?

5    **A.**   Yes, there were phone calls that we saw in the toll

6    records.

7              **MS. CHOPRA:**  No further questions, Your Honor.

8              **THE COURT:**  May this witness be excused?

9              **MR. YOUNG:**  Yes, subject to recall, Your Honor.

10             **THE COURT:**  Okay.

11             **MS. HALL:**  Yes.  Yes, Your Honor.

12             **THE COURT:**  Okay.  Why don't we go ahead and take an

13   early break at this point, 20 minutes, if you can be back in

14   20 minutes.

15       You're reminded you're not to do any research about the

16   case, not to discuss the case with anyone, and we'll see you

17   back in 20 minutes.

18             (End of partial transcript.)

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, August 12, 2024

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter