**Volume 2**

**Pages 81 - 167**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 22-CR-02701-BAS |
| | ) | |
| DONALD DANKS, JONATHAN | ) | |
| DESTLER, AND ROBERT LAZERUS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Thursday, August 15, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL**

**(TESTIMONY OF DONALD DANKS)**

**APPEARANCES:**

For Plaintiff:

        TARA K. MCGRATH
        United States Attorney
        880 Front Street, Room 6293
        San Diego, California 92101
      **BY:  NICHOLAS W. PILCHAK, ESQ.**
           **JANAKI GANDHI CHOPRA, ESQ.**
           **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
        LAW OFFICE OF PATRICK Q. HALL
        402 West Broadway, Suite 1560
        San Diego, California 92101
      **BY:  PATRICK Q. HALL, ESQ.**
           **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
             Official Court Reporter

```
 1   **APPEARANCES**:   (CONTINUED)

 2   For Defendant Jonathan Destler:
                         SNELL & WILMER
 3                       12230 El Camino Real, Suite 300
                         San Diego, California 92130
 4                BY:    **ANDREW PHILLIP YOUNG, ESQ.**
                         **ATTORNEY AT LAW**
 5
                         MILLER BARONDESS, LLP
 6                       2121 Avenue of the Stars, Suite 2600
                         Los Angeles, California 90067
 7                BY:    **LOUIS "SKIP" MILLER, ESQ.**
                         **ATTORNEY AT LAW**
 8
     For Defendant Robert Lazerus:
 9                       LAW OFFICE OF MARTHA M. HALL
                         555 West Beech Street, Suite 508
10                       San Diego, California 92101
                  BY:    **MARTHA MCNAB HALL, ESQ.**
11                       **ATTORNEY AT LAW**

12                       LAW OFFICE OF ADAM F. DOYLE
                         444 West C Street, Suite 310
13                       San Diego, California 92101
                  BY:    **ADAM F. DOYLE, ESQ.**
14                       **ATTORNEY AT LAW**

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2    Thursday, August 15, 2024 - Volume 2

 3    DEFENDANT DONALD DANKS'S WITNESS              PAGE VOL.

 4    DANKS, DONALD (RECALLED)
      (PREVIOUSLY SWORN)                             84   2
 5    Direct Examination (Resumed) by Mr. Hall       84   2
      Cross-Examination by Ms. Hall                 162   2
 6
                        E X H I B I T S
 7
 8    DEFENDANTS' EXHIBITS                    IDEN  EVID VOL.

 9     1160                                   136   137   2

10     1161                                   140   140   2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    <u>**Thursday - August 15, 2024**</u>                              <u>**12:59 p.m.**</u>

 2                        <u>**P R O C E E D I N G S**</u>

 3                           **---oOo---**

 4        (Proceedings were heard in the presence of the jury:)

 5            **THE COURT:**  All right.  We are back on the record.

 6    All jurors are present.  All defendants are present.  All

 7    counsel are present.

 8        You're reminded you're still under oath to tell the truth.

 9            **THE WITNESS:**  Thank you.

10            **THE COURT:**  Mr. Hall?

11            **MR. HALL:**  Thank you.

12                        <u>**DONALD DANKS**</u>,

13    called as a witness for the Defendant Donald Danks, having been

14    previously duly sworn, testified further as follows:

15                   <u>**DIRECT EXAMINATION (RESUMED)**</u>

16    **BY MR. HALL:**

17    **Q.**   Mr. Danks, we were on Exhibit 463 earlier, and I talked

18    about one of the bubbles, but I want to talk about the next

19    bubble.

20        All right.  Let's scroll down -- there we go.

21        "Just got back from the play and going to turn in.  I have

22    an early call with Loop tomorrow.  I think they're pulling out

23    some news about new technology and the decrease in operating

24    expenses."

25        And, again, this is between you and Mr. Lazerus; correct?

1    **A.**    Correct.

2    **Q.**    Right?

3         And you saying, "Next week, I think there's going to be

4    something about our ways to resin plants, and the 8-K about the

5    joint venture will be out July 9th."

6         Okay.  Do you see that?

7    **A.**    I do.

8    **Q.**    Okay.  So when you say, "I think they're putting out some

9    news," that means Loop; correct?

10    **A.**    Correct.

11    **Q.**    And were you aware of a press release coming out at that

12    time?

13    **A.**    I -- I believe I -- that's what this is referring to.

14    **Q.**    Okay.  And also something about decrease in operating

15    expenses; right?

16    **A.**    Correct.

17    **Q.**    And at -- on the board, you had access to the operating

18    expenses information; right?

19    **A.**    Yes.

20    **Q.**    And then you also say, "Next week, I think there's going

21    to be something about our ways to resin plants."

22         What are "our ways to resin plants"?

23    **A.**    I dictate messages a lot of time, and that was supposed to

24    be "waste to resin plants."  They can take waste and make it

25    all the way through -- to resin for plastic.

1  **Q.**   Okay.  And when you say "there's going to be something,"

2  what is -- what are you referring to?

3  **A.**   Probably some news.

4  **Q.**   Meaning a press release of the company?

5  **A.**   A press release by the company.

6  **Q.**   Okay.  And what's the 8-K about the joint venture?

7  **A.**   What's the date here?

8  **Q.**   June 21st, 2018.

9  **A.**   Maybe an 8-K about the joint venture.  I'm not really

10 certain if -- on the date, if it's the Indorama joint venture,

11 but it might be the Indorama joint venture.

12 **Q.**   Okay.  And what's -- what's an 8-K?

13 **A.**   An 8- -- any time there was a material event in the

14 company, within, I think, four days, the company has to put out

15 what's known as an 8-K filing to disclose that -- that

16 development to the public.

17 **Q.**   So in this text, are you talking to Mr. Lazerus about

18 information that's not yet public information?

19 **A.**   I am.

20 **Q.**   And why?

21 **A.**   Robert's on my team.  He, Coach, and sometimes Jon and I

22 had information.  I just -- in building my team, I -- I found

23 it more effective if they knew what was going on with the

24 company, with the caveat that they were not to share it or

25 trade on it.

1        And it just made them more effective as they were going

2    out and trying to help me with raising capital.

3    **Q.**   Why would it make them more effective to have nonpublic

4    information?

5    **A.**   Well, they just -- they would have more confidence in what

6    the company's doing and be more effective in their -- not

7    telling people what's going on but just, in their own mind,

8    knowing that there's things going on.

9        And it -- and we just had developed a very close

10   relationship, and I trusted them with this information and not

11   to trade on it.

12   **Q.**   Have you ever been involved in sales?

13   **A.**   Have I ever been involved in sales?

14   **Q.**   Yes.

15   **A.**   Other than selling -- selling stock to investors, or do

16   you mean, like, sale -- like, selling -- like, being a

17   salesman?

18   **Q.**   Like being a salesman.

19   **A.**   Yeah, I've been involved in sales before.

20   **Q.**   When you were with Brook- -- was it -- Brook Store was the

21   first company?

22   **A.**   With Brooks, yeah, I was -- I was involved with sales in

23   that.

24   **Q.**   All right.  Was it important to you to have confidence in

25   the product you were trying to sell?

DANKS - DIRECT / HALL

1   **A.**   Absolutely.

2   **Q.**   Is that what you're trying to do here with Mr. Lazerus, or

3   what are you trying to do?

4   **A.**   All I was trying to do is to have him feel like he was

5   part of the team and have more confidence because, again, the

6   capital demands for this company were intense, and I just

7   needed everybody to be effective.

8   **Q.**   Thank you.

9        I'm going to switch topics slightly here.

10       **MR. HALL:**   Can we pull up 436, please.

11  **BY MR. HALL:**

12  **Q.**   All right.   This is a text to -- well, I can't see it.

13       Do you know who this is a text to?

14  **A.**   Can you see the phone number?

15       I believe that's Robert -- oh.   That's James Harrison

16  and --

17  **Q.**   Are you sure?   Can you tell?

18  **A.**   I think it's James Harrison and Robert Lazerus.

19       **MR. HALL:**   Okay.   And so -- can we go back down to the

20  bubble, please.

21  **BY MR. HALL:**

22  **Q.**   "As of the last week, we're still 22 shareholders short."

23       What's that mean?

24  **A.**   To become a -- to qualify for a NASDAQ listing, there's a

25  requirement that you need 400 -- at least 4- -- a minimum of

DANKS - DIRECT / HALL

 1 | 400 shareholders, and I believe I had got the shareholder list,
 2 | and we were 22 shareholders short of that number.
 3 | **Q.**   Why do you say it's a moving number?  Did NASDAQ change
 4 | their --
 5 | **A.**   No, because you could have shareholders sell out of their
 6 | position, and they'd no longer be a shareholder, and the number
 7 | could go down or -- or a new shareholder could -- could --
 8 | could buy without -- you know, just increase the number.
 9 |      So that was always fluctuating, but we need -- what I was
10 | trying to do is to make sure that we had enough to qualify for
11 | NASDAQ.
12 |           **MR. HALL:**  Can I get 707 up, please.
13 |      Can we blow that up?
14 | **BY MR. HALL:**
15 | **Q.**   Can you tell -- this appears to be a text message on
16 | June 20th to Robert.  What are you trying to do here?
17 | **A.**   The same thing.  I got an updated shareholder report.  I'm
18 | reminding him, you know, to reach the requirement, we need at
19 | least 19 more.
20 |      So I was just saying we should all put an effort to try to
21 | introduce the company to new people and just to have the
22 | minimum amount -- minimum amount of shares so they would help
23 | us qualify to get onto NASDAQ.
24 | **Q.**   Why -- was NASDAQ important to you individually or to the
25 | company?

DANKS - DIRECT / HALL

1    A.   It wasn't to me individually.   It was really important to

2    the company.

3    Q.   Why?

4    A.   So let me see the date on this, see if -- as -- as has

5    been -- as has come out in this trial, there -- Loop had an

6    insatiable demand for cash to be able to build pilot plants and

7    further the company.

8         And, you know, there's multiple reasons why NASDAQ would

9    help.   It's a national exchange.   It's one of the most

10   recognized names in the world.   It would give the company

11   access to institutional investors, give us access to research

12   where -- where research analysts could come in and -- and write

13   up a report and expand the knowledge and exposure of the

14   company to the market.

15        It was just -- it was a really critical step, and we were

16   just trying to make sure that we got to the 400 share- --

17   shareholders.

18   Q.   Let me go back for a second and ask you:   What -- an

19   institutional -- at the time, it's on the OTC market, the

20   over-the-counter market; right?

21   A.   Correct.

22   Q.   Okay.   And so why would institutional -- why would

23   institutional investors be more impressed with it being on

24   NASDAQ versus OTC?

25   A.   I've been doing this for a long time, and I've never known

DANKS - DIRECT / HALL

1  a bona fide institutional investor to invest in OTC stock.

2  There -- I think a requirement of a lot of them is, you know, a

3  major exchange like the New York Stock Exchange or NASDAQ.

4  **Q.**   A requirement of a lot of them, you said, meaning who?

5  **A.**   Just all the -- all the largest institutions throughout

6  there.  They won't invest -- they won't put -- they won't put

7  money into OTC stocks.

8  **Q.**   Okay.  Thank you.

9       Can we go to 646?  I'm going to change topics again there.

10      Who was Scott Jackson?

11  **A.**   Scott Jackson is one of our investors that lives -- lives

12  in Newport Beach.

13      **MR. HALL:**  All right.  And can you go up and show us

14  the date of this?

15  **BY MR. HALL:**

16  **Q.**   That's -- all right.  Do you see the date on this?

17  **A.**   It's 9/6/18.

18      **MR. HALL:**  All right.  And then -- now can we scroll

19  back down to the -- all right.

20  **BY MR. HALL:**

21  **Q.**   Well, first of all, this -- this signature block is

22  different than Touchstone Capital Advisors.  What -- what email

23  was this being sent from?

24  **A.**   This was my Loop Industries email, and this is when I

25  transitioned -- this is after I had transitioned off the board

DANKS - DIRECT / HALL

```
 1  and became a strategic adviser.

 2  Q.   Okay.  And so -- and -- and did you regularly communicate

 3  with Mr. Jackson by email?

 4  A.   Mr. Jackson would email me a lot.

 5  Q.   Okay.  And to your knowledge, he -- at the time of this --

 6  what did we say?  September 6th, 2018.  Had he invested in

 7  Loop?

 8  A.   Yes, he had.

 9  Q.   Okay.  So in this email -- I'm going to skip down to --

10  well, let's read -- you're talking about a material error of

11  omission in one of the addendum governing the JV, "and it's

12  being remedied as we speak."

13       What are you talking about there?

14  A.   We were trying -- we were trying to finalize the

15  negotiation with Indorama.  And as it says here, there was a

16  material error of omission that -- and they -- the company

17  needed to resolve that with Indorama before they could finalize

18  it and sign it.

19  Q.   All right.  And did -- was that public information,

20  though, that --

21  A.   No, it wasn't.

22  Q.   All right.  And so were you considered -- were you giving

23  Mr. Jackson nonpublic information?

24  A.   Yes, I was.

25  Q.   Why were you doing that?
```

1  **A.**   Mr. Jackson kind of insisted on -- on getting information.

2  And after a while, I said, "You know what?  You can probably

3  get information -- I checked with legal counsel -- if you sign

4  an NDA, which would prevent you from being able to share that

5  with anybody and prevent you from being able to trade."

6       And he said he would be glad to do that.

7  **Q.**   And so "NDA" meaning, again --

8  **A.**   A nondisclosure agreement.

9  **Q.**   And -- and to your knowledge, did Mr. Jackson sign that?

10 **A.**   I believe he did.

11 **Q.**   Would -- was -- what was your understanding of the NDA?

12 Would that -- could he trade if he signed an NDA?

13 **A.**   No, he couldn't.

14 **Q.**   Thank you.

15      Let's go to 643, please.

16      All right.  This is a -- this is another email.  What's

17 the date of this one?

18 **A.**   September 4th, 2018.

19 **Q.**   So it's two days before that last one; is that right?

20 **A.**   I can't remember the date of the last one.

21 **Q.**   That's not important.

22 **A.**   Okay.

23 **Q.**   All right.  And this email is -- who's this to?

24 **A.**   It's to -- well, originally -- I think, if you go down to

25 the bottom, it's from Scott to me.  That's kind of the thread.

DANKS - DIRECT / HALL

1  Q.    Okay.  At the top, though, it's from you?

2  A.    It's from me to Scott Jackson.

3  Q.    Okay.  And -- and you're saying you just spoke with the

4  legal team.  "The new release is in the hands of Indorama for

5  their approval.  They said they expect it back today but

6  couldn't guarantee it.  We'll keep you posted."

7       All right.  So was there some new release that was about

8  to be disseminated to the public?

9  A.    I believe there was.

10  Q.    And was it about Indorama?

11  A.    I believe that's what it was about.

12  Q.    And is this email -- do you consider this email to be

13  nonpublic information about the company?

14  A.    This is -- this is -- this is material nonpublic

15  information.

16  Q.    All right.  And, again, why were you giving this to

17  Mr. Jackson?

18  A.    I was sending it to Mr. Jackson under the nondisclosure

19  agreement that he had signed.

20           MR. HALL:  Can we scroll down to the -- all right.

21  BY MR. HALL:

22  Q.    Back in August, it appears that he said -- he's asking,

23  "You still good, Don?"

24       Do you see that at the very bottom?

25  A.    Yes.

1    **Q.**   And you're saying, "All is great.  We're waiting until

2    after Labor Day to start putting news out.  Manufacturing joint

3    venture is done, several of our bottling after" -- "after

4    contracts are signed, and we have a number of marketing

5    initiatives to announce."

6        Do you see all that?

7    **A.**   I sure do.

8    **Q.**   Is that -- was that public information?

9    **A.**   That is material nonpublic information.

10   **Q.**   And, again, you were sharing it with Mr. Jackson why?

11   **A.**   I was sharing it with Mr. Jackson because he had signed a

12   nondisclosure agreement to not trade on it, not share it with

13   anybody else.

14   **Q.**   All right.  Let me go to 430- -- I think it's 432.  I

15   sadly cannot read my own handwriting at times.

16       All right.  This is another email between you and

17   Mr. Jackson in September of 2018.  What are you saying here?

18   **A.**   "We survived a power play by a huge company that is used

19   to getting its way.  Four times, we reached agreement with

20   their changes; and each time, they came back with yet another.

21   We held fast and got the agreement signed on our terms.  Daniel

22   stayed patient and resolute."

23       "So" -- "see" -- it should say "so" -- "so we're" -- it

24   should say, "So we're circulating the draft press release now,

25   and it will be out after everyone signs off, not an atypical

1    move" -- should have been "on their part, but they took it to

2    an extreme.  Just spoke to Daniel, and he thinks we could have

3    it out by tomorrow but will confer with our JV partners as it

4    will be a joint release."

5    **Q.**    Okay.

6    **A.**    "Oy vey.  What a process.  DD."

7    **Q.**    Okay.  "JV."  What's that mean?

8    **A.**    A joint venture.

9    **Q.**    All right.  And, again, is this -- is this public

10   information?

11   **A.**    No.  This is, again, material nonpublic information that I

12   was sharing with Mr. Jackson under the nondisclosure agreement

13   that he had signed.

14   **Q.**    Did you think he could trade on this information --

15   **A.**    I --

16   **Q.**    -- if you gave it to him?

17   **A.**    I do -- I told him he couldn't trade.  He knew he couldn't

18   trade.

19   **Q.**    Thank you.

20          **MR. HALL:**  Can we go to 429, please.

21   **BY MR. HALL:**

22   **Q.**    Is this another email with Mr. Jackson?

23   **A.**    Yes, it is.  He asks me, "No bad news?"

24          And I said, "No bad news.  Company is forging ahead.  I

25   talked to the" --

DANKS - DIRECT / HALL

1    **Q.**    Okay.  Don't just read it to me.

2    **A.**    Okay.

3    **Q.**    Let me just see if we can --

4    **A.**    Okay.

5    **Q.**    -- pick out --

6    **A.**    You --

7    **Q.**    -- a phrase that -- "Every ounce of energy is going in to

8    open it up, the first facility, but I've got a sense that

9    there's a number of facilities right behind that."

10        All right.  So you're telling Mr. Jackson your sense that

11    there may be other facilities about ready to open up?

12    **A.**    Correct.

13    **Q.**    And did you consider that to be public information?

14    **A.**    Yes.  This is material nonpublic information that I shared

15    with Scott Jackson.

16    **Q.**    Okay.  And this is after that very first -- this is --

17    looks like it's a year later from that first one in September

18    of 2018?

19    **A.**    Correct.

20    **Q.**    Okay.  Thank you.

21            **MR. HALL:**  Let's go to 434 -- 431, please.

22        Okay.  So let's go down to the bottom there.  Let's -- can

23    you -- an inch higher.

24    **BY MR. HALL:**

25    **Q.**    What's the date of this one?

1    **A.**   November 5th, 2019.

2    **Q.**   All right.  And you're talking about -- that "There's a

3    new short group leaning heavily on the stock this morning."

4       Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   And -- and this is -- is this in reference to what we've

7    heard as the Hindenburg?

8    **A.**   I believe this is exactly the time frame when the

9    Hindenburg report was released.

10   **Q.**   Okay.  You say you spoke to the company.  You urged them

11   to put news out.

12      All right.  Had the company -- had Loop responded to the

13   Hindenburg at this time?

14   **A.**   At this point, they hadn't.

15   **Q.**   And you say you're working on new buyers, "but I wanted to

16   let you know that there's nothing fundamentally wrong other

17   than the shorting.  The company is pushing the regulators on

18   the naked shorting, and I'll keep you posted when I find it.

19   In the meantime, I'm continuing to speak to investors and urge

20   them to take advantage of the artificially low price."

21      So when you say "the artificially low price," why were you

22   saying that?

23   **A.**   Because the stock had dropped precipitously based on a

24   very damaging, false research report put out by Hindenburg.

25   **Q.**   And -- okay.  And you reference it as a new short group --

1   new short group.

2       Do you see that on that top --

3   **A.**   Where?

4   **Q.**   In the first sentence, "Scott, I'm sending you a

5   preemptive..."

6   **A.**   Yeah, there was a new short group leaning heavily on the

7   stock.

8   **Q.**   Who are you referring to as the short group there?

9   **A.**   I believe Hindenburg.

10  **Q.**   All right.  Thank you.

11      Can we go to 437, please.

12      All right.  This is a little bit different format, but do

13  you see -- what is this?

14  **A.**   This is an email that I'm sending to Scott that we -- we

15  hired a new investor relations group that I referred to

16  earlier, the MZ Group, that I cited on several calls.  They're

17  one of the top five in the country.

18  **Q.**   Okay.  Don't read it.

19  **A.**   Okay.

20  **Q.**   Let me just -- let me see if I can shorten this.

21  **A.**   Okay.

22  **Q.**   Did you consider the fact that the hiring of MZ Group, a

23  new investors relation group -- did you consider that to be

24  public information, or was that nonpublic information?

25  **A.**   This is more -- more borderline, but I really didn't -- I

 1  don't know if it was material, but it was -- it was nonpublic

 2  information that I gave to -- to Scott Jackson under his NDA.

 3  **Q.**   Do you -- do you recall if there was some kind of press

 4  release that was issued by Loop about disclosing that the

 5  MZ Group had been hired for investor relations?

 6  **A.**   I can't remember if they put it in an 8-K or press

 7  release.

 8  **Q.**   All right.  And -- and would -- was there -- and an NDA

 9  that we talked about earlier -- was there any kind of time

10  limit on that, to your knowledge?

11  **A.**   It was an open NDA until it was terminated.

12  **Q.**   All right.  And do you know whether Mr. Jackson was

13  trading in the open market on Loop at this time?

14  **A.**   I have no idea, but I hope to goodness he wasn't.

15  **Q.**   All right.  Thank you.

16       Can we go to 417, please.

17       Again, this is -- appears to be you and Mr. Jackson in an

18  email exchange.  This one's dated on -- in the middle of the

19  page there, do you see the date of that?

20  **A.**   I do.  October 12th, 2020.

21  **Q.**   What -- is that date familiar to you?

22  **A.**   There's so many dates.  I don't know what this is

23  associated with.

24  **Q.**   Do you recall the date that the Hindenburg report was

25  first published?

DANKS - DIRECT / HALL

1  **A.**   The first one was in 2019.

2  **Q.**   All right.  Well, do you recall one being published in

3  20- -- in October 12th of '20?

4  **A.**   I believe that there was a second one in 2020.  I'm not

5  really certain, but I think there was.

6  **Q.**   All right.  And in this, you wrote to Mr. Jackson, "It's

7  definitely not shorting.  It's definitely sellers.  I'm getting

8  calls from people about a fundamental problem."

9       Were -- were you getting calls from people?

10 **A.**   Yes, I was.  There was a lot of pressure on the stock.  I

11 called around to a couple of the brokers that I worked with to

12 find out if there was a lot of shorting going on or if the

13 trades were long, and it seemed the feedback I got -- that it

14 was -- it was just long selling and -- the question again?

15 **Q.**   Well, what's the effect of long selling?

16 **A.**   It would drive the stock -- price of the stock down.

17 **Q.**   All right.  And what -- to your knowledge, do you know who

18 the long sellers were?

19 **A.**   No.  I never found out.

20            **MR. HALL:**  Okay.  Can we scroll up just a little bit

21 further?

22 **BY MR. HALL:**

23 **Q.**   Maybe this will help refresh your recollection.

24       Okay.  You make a reference -- this is October 13th of

25 2020.  "This is a short report, and it's just going to take a

1    while to recover from it."

2        Does that refresh your recollection as to what you're

3    talking about?

4    **A.**   Yes.  I may have missed -- I may have mixed it up down at

5    the bottom a bit.  It's definitely short selling, not long

6    selling.

7    **Q.**   Okay.

8    **A.**   Yeah.

9    **Q.**   So -- so by that time you -- when you say it's a BS short

10   report -- I'm going to abbreviate that -- what do you mean by

11   "short report"?

12   **A.**   Another report that had false information about the

13   company, and it was -- it was driving the stock price down, and

14   I just --

15   **Q.**   Okay.

16   **A.**   -- told them it's going to take a while for it to recover.

17   **Q.**   All right.  Can we go to 434, please.

18       Looks like another email between you and Mr. Jackson.

19   What are you talking about here?

20   **A.**   He says, "Thank you.  No news."  And then he asked me,

21   "Have they cut you off?"

22       And I say, "No, they haven't."  I was assuming had the

23   company cut me off.

24   **Q.**   All right.  So were you still getting information from the

25   company at this time?

DANKS - DIRECT / HALL

1   **A.**   Occasionally, I would get information.

2   **Q.**   Okay.  And was there any inside information discussed

3   here?

4   **A.**   No.

5   **Q.**   Did -- did you understand Mr. Jackson to be asking if you

6   had been cut off from inside information?

7   **A.**   That's what I thought he meant.

8   **Q.**   All right.  Thank you.

9        Let's go to 464.  I want to talk about -- these are text

10  messages.

11       All right.  What's the date of this text message?

12  **A.**   May 6th, 2018.

13  **Q.**   And you're talking to -- you're talking about talking to

14  somebody named Daniel?

15  **A.**   Daniel Solomita.

16  **Q.**   "And they're in the very final stages of negotiating the

17  final" -- "very final point on the deal with Indorama."

18       Was that public information?

19  **A.**   No, it wasn't.

20  **Q.**   And so you were giving nonmaterial -- did you consider it

21  to be material?

22  **A.**   It was material nonpublic information, yeah.

23  **Q.**   And -- and why were you giving it to Robert?

24  **A.**   Again, kind of because of the team concept so he knew what

25  was going on, would have confidence as we were out trying to

```
 1    put capital together.

 2    Q.   Okay.  Thank you very much.

 3         Let's go to 633, please.

 4         All right.  This is "I just blind" -- "blind cc'd you on

 5    an email regarding Loop.  Read it and give me a call."

 6              MR. HALL:  Can we go to the next page?

 7    BY MR. HALL:

 8    Q.   And -- and Mr. Lazerus responds to you, asking a question:

 9    "Did Loop work out their contractual issues?"

10         Do you see that?

11    A.   Yes.

12    Q.   So had you and Mr. Lazerus discussed that Loop was engaged

13    in some type of contract negotiations?

14    A.   Yes, we had.

15    Q.   Do you remember which contract this was?

16    A.   9/8/18 -- I'm not sure.  I can't remember.  It could have

17    been -- that might have been -- I'm not -- I'm not sure.

18    Q.   All right.  And then you tell him, "I'm talking to Daniel

19    tomorrow and will call you afterwards"?

20    A.   Yes.

21    Q.   All right.  But this would have been, again, nonpublic

22    information about these contractual issues; right?

23    A.   Correct.

24    Q.   And -- and, once again, did you think that there was any

25    problem in sharing this with Mr. Lazerus?
```

1    **A.**    No, because he was -- he was part of our -- the

2    fundraising team, and he -- he had had access to this, and he

3    knew not to trade on it.

4    **Q.**    Did you think that this was insider trading?

5    **A.**    Did I --

6    **Q.**    Did you think that this was part of insider trading?

7    **A.**    No.

8    **Q.**    Okay.  Let's go to 457, please.

9          All right.  Here, you're talking about just getting a text

10   from Daniel saying that "Tomorrow is probably not going to be

11   the day."

12          What did -- I presume "Daniel" is Solomita.

13   **A.**    Yes.

14   **Q.**    And when you're saying, "Probably" -- "tomorrow is

15   probably not going to be the day," what are you talking about?

16   **A.**    The day -- from -- tomorrow is probably not the day that

17   the news is going to be released.

18   **Q.**    About what?

19   **A.**    Whatever the topic was.  This -- the date seems close to

20   that last text message, so for whatever that topic was.

21   **Q.**    All right.  And -- and so you're telling Robert that

22   there's not -- the -- I mean -- let me strike that.

23          Is there any reference to a press release here?

24   **A.**    It doesn't say anything about a press release.

25   **Q.**    Okay.  But you're saying, "Tomorrow is probably not going

1    to be the day."  What do you mean?

2    **A.**    My assumption is it's not going -- based on the

3    previous -- this text message, that it's probably not going to

4    be the day it gets released.

5    **Q.**    All right.  Let's go to -- but that would have been,

6    again, material nonpublic information?

7    **A.**    Correct.

8    **Q.**    Okay.  Thank you.

9        Let's go to 648, please.

10       All right.  This is an email chain that -- it appears that

11   Mr. Solomita has forwarded to you talking about a press

12   Reece -- press release tomorrow at 7:30 a.m.

13       Do you see that?

14   **A.**    Yes.

15   **Q.**    And it's about a Coca-Cola announcement.  Do you see that?

16   **A.**    I do.

17   **Q.**    And that -- and what's the date of that email?

18   **A.**    From Nelson Switzer?

19   **Q.**    Yes.

20   **A.**    November 28th, 2018.

21   **Q.**    All right.  Was that -- was that public information at

22   that time?

23   **A.**    Not at the time that this was written.  I think it might

24   have been right before the close of the market the day before

25   that the press release is going out because they say it's going

1    to be released the next morning.

2    **Q.**    Okay.  Mr. Solomita is saying on the 28th, "Called you

3    back if you want to talk."

4         Did -- do you remember talking to him?

5    **A.**    I probably did call -- call back whenever he said -- you

6    know, gave me the opportunity to talk with him.  He was so

7    busy, I probably did call and talk with him.

8    **Q.**    Okay.  Let's skip now to 477.

9         What's the date of this text?

10   **A.**    This is the -- the next day?  The last one was, I think,

11   11/28; correct?

12   **Q.**    I can't answer that.

13   **A.**    Yeah, it was.  You asked me if it was 11/28.  This was

14   the -- this is the next day.

15   **Q.**    Okay.

16   **A.**    Yep.

17   **Q.**    And what are you saying in here?

18   **A.**    I'm saying, "Robert, it's an all-hands-on-deck effort to

19   get buying going in Loop on the back of the Coca-Cola

20   announcement.  Whatever you can do would be much appreciated."

21   **Q.**    Okay.  So let me -- let me just -- the Coca-Cola

22   announcement -- is that the announcement that was attached in

23   the email the day before?

24   **A.**    Yes.

25   **Q.**    All right.  And so at this point in time, are you aware of

DANKS - DIRECT / HALL

```
 1  whether a press release had been issued to Coca-Cola?
 2  A.   Yes.
 3  Q.   Or on Coca-Cola?
 4  A.   On Coca-Cola and Loop.
 5  Q.   All right.  And why -- what -- so what's
 6  "all-hands-on-deck" mean?
 7  A.   Well, because -- because we are always trying to maximize
 8  the value of the company, I wanted to make sure that press
 9  release got into the hands of all of our investors.
10       So "all-hands-on-deck" means -- Robert had probably a
11  couple of dozen people that he worked with all the time.  I
12  wanted to make sure that they saw the press release and were
13  aware of it.
14  Q.   Okay.  But you're saying "on the" -- what does the -- what
15  does the phrase "on the back of the Coca-Cola announcement"
16  mean to you?
17  A.   Meaning after it was released.
18  Q.   Why would it be important to you to get buying going in
19  Loop after a press release?
20  A.   To take -- to take advantage of the news and to maximize
21  the value of the company.  That was my -- that was my job.
22  Q.   And -- and -- and why would that be important to the
23  company?
24  A.   Again, you always want to get the -- the maximum share
25  value consistent with the company's value, and I believe that
```

1    we were just trying to do that.

2    **Q.**    Okay.  Let me go to 305, please.

3                 **PARALEGAL:**  I'm sorry.  3- --

4             **MR. HALL:**  305.

5         All right.  Just kind of blow that up because that's

6    been -- I believe it's been redacted.  Can you blow it up so

7    that it is -- I don't think we have a redacted copy.

8         There you go.  Thank you.  I apologize.

9    **BY MR. HALL:**

10   **Q.**    All right.  This is an email in -- well, what is this

11   email?

12   **A.**    It's an email where I had sent an email to the -- to -- I

13   had a database of our share -- a lot of the shareholders,

14   mostly -- mostly private placement shareholders, and telling

15   them that "I had sent an email containing material nonpublic

16   information.  It was not intended to be distributed to you and

17   which I was not authorized to share it with you."

18   **Q.**    Okay.  Don't -- don't just read it.

19   **A.**    Okay.

20   **Q.**    I'm asking you what -- what is --

21   **A.**    Okay.  Well, this is -- a press -- press release had gone

22   out, and I talked to legal, and they said, "What you should do

23   is just immediately notify them that you shouldn't" -- "they

24   shouldn't redistribute" -- "redistribute it, and they should

25   permanently delete the email as well as any copies and

DANKS - DIRECT / HALL

1   attachments that were there."

2       I think the legal team wrote this for me.

3   **Q.**   Okay.  So would this have applied to Scott Jackson?

4   **A.**   If Scott Jackson would have got it -- he -- he was under

5   an NDA.  So it wouldn't have included him.

6   **Q.**   Okay.  And -- but why were you sending this out?

7   **A.**   Because there was something sent to people that did have

8   material nonpublic information, and it was sent out

9   inadvertently.

10  **Q.**   To your knowledge, did anybody trade on that?

11  **A.**   To my knowledge, I don't know anybody that traded on it.

12  **Q.**   Okay.  Thank you.

13      Let me -- I want to switch to a topic of what I call

14  battling the shorts, just to give you some perspective.

15      Did -- did you -- do you know of somebody named

16  Andrew Left?

17  **A.**   Yes, I do know someone named Andrew Left.

18  **Q.**   How long have you known Andrew Left?

19  **A.**   For almost 20 years.

20  **Q.**   All right.  What does Andrew Left do?

21  **A.**   Andrew Left has run a couple of -- of funds, short funds,

22  that builds short positions in companies and then puts out

23  reports to be able to -- you know, sometimes true, sometimes

24  not true -- to drive the stock -- the price of a stock down.

25  **Q.**   You say "sometimes not true."

1          Had you had any personal experience with Andrew Left?

2     **A.**    Very much so.

3     **Q.**    What -- tell me -- tell me about what that personal

4     experience was.

5     **A.**    In 2005, I was running a company, and the company was

6     doing extremely well.  The shorts had that -- when stock was

7     probably in the single digits -- that it was going to go --

8     they tried to short it down from there, but the company kept

9     performing, kept performing.  The stock that -- and so --

10    **Q.**    I'm just asking about Andrew Left.

11    **A.**    Andrew Left.

12          So Andrew Left is -- he published, through his website

13    StockLemon.com, a false -- a very negative, false, and

14    defamatory email, a lot of defamatory information about me.  It

15    was --

16    **Q.**    You personally?

17    **A.**    Personally, a lot of -- he -- he basically made me look

18    like a criminal.  He said -- there were a number -- a number of

19    things within that report.

20    **Q.**    Did you do anything as a result of that?

21    **A.**    I hired an attorney and sued him for defamation.

22    **Q.**    And where was that suit filed?

23    **A.**    That was in Superior Court in Los Angeles.

24    **Q.**    And was -- did that suit ultimately get resolved?

25    **A.**    We battled for a while, and finally we negotiated a

 1  settlement whereby he would --

 2          THE COURT:  Okay.

 3          MS. CHOPRA:  Objection.

 4          THE COURT:  The question is just:  Did it get

 5  resolved?  Yes or no?

 6  BY MR. HALL:

 7  Q.  Did it get resolved?

 8  A.  Yes, it did.

 9  Q.  Did Mr. -- did Mr. Left --

10  A.  Thank you.

11  Q.  -- end up retracting his published statements?

12  A.  As part of the settlement, he had to take down all the

13  false and defamatory information about me.

14  Q.  When you were at Loop, did you become aware, at some time,

15  that Mr. Left was also shorting stock in Loop?

16  A.  I became aware that he was shorting stock in Loop.  He

17  was.

18  Q.  And how did you become aware of that?

19  A.  I -- he sent an email to the company, an email that

20  appeared to try to extort the company to sell them -- sell him

21  shares to cover his short position.  And it was just a very --

22  I don't even know what word -- it was just -- it was just

23  completely unfounded and something that he shouldn't have done.

24      And he --

25          THE COURT:  Well, the question was:  How did you

1  become aware that he was --

2          THE WITNESS:  I became aware from the email he sent to

3  the company.

4  BY MR. HALL:

5  Q.   Thank you.

6          MR. HALL:  So now -- if we can get 458 up, please.

7      There we go.

8  BY MR. HALL:

9  Q.   This is a text to -- to whom?  Can you tell?

10          MR. HALL:  Can we scroll up just a touch?

11          THE WITNESS:  That looks like Robert Lazerus's number.

12  BY MR. HALL:

13  Q.   Okay.  And you're talking about working on not letting

14  this go below nine bucks.  Why -- why were you working on that?

15  A.   There was -- there was another really aggressive short

16  going against the stock, and what I wanted to do was try to --

17  try to get back and go in the stock to be able to combat that

18  to make sure that the stock didn't crater and go to nothing.

19  Q.   All right.  And so you said you're on with an investor

20  from Montreal.  Do you remember who that was?

21  A.   No.  There -- I knew several dozen in Montreal.  I'm not

22  sure which one it was.

23  Q.   Okay.  You asked Mr. Lazerus, "Can you get Allan to sit on

24  bid at $9?"

25      Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    All right.  What does "sit" -- excuse me.  What does "sit

3    on bid" mean to you?

4    **A.**    It means for him to -- to bid $9 and don't -- and stay

5    there.

6    **Q.**    And can you bid $9, and if somebody accepts it, it --

7    **A.**    If somebody hits the bid?

8    **Q.**    Right.

9    **A.**    Yeah.  Then he could -- he could buy more stock at $9

10    after that.

11    **Q.**    All right.  Why did you want -- why did you want Allan to

12    do this?

13    **A.**    Again, the -- the short -- the constant short pressure in

14    the stock was -- was -- it was a problem, and I was just --

15    Allan was a buyer, and so I just asked him to sit on the bid to

16    prevent shorts from being able to break the stock down.

17    **Q.**    Do you recall what the price was back then that day?

18    **A.**    I don't -- I don't remember that.

19    **Q.**    Was $9 higher or lower?

20    **A.**    I think $9 was lower.  I was just trying to pick a spot

21    to --

22    **Q.**    Okay.  And then -- and then you also say, "I'll give you

23    the timing on news when I call."  What's that?

24    **A.**    That there would be news coming out, and I'd let Robert

25    know what -- what it was about.

1  **Q.**   All right.  But -- I mean, did it occur to you that, by

2  asking Allan to sit on a bid at $9 and also telling him that

3  news -- "I'll give you the timing on news," did you think that

4  that would be relayed to Mr. Brennan about there was some news

5  coming?

6  **A.**   No, not at all.  That was intended --

7  **Q.**   Why not?

8  **A.**   Because, again, Robert and Coach and I shared information.

9  **Q.**   Thank you.

10       **MR. HALL:**  Let me go to -- well, let's -- let me

11  check -- can you scroll down?  Let me check and see if there's

12  another bubble.

13  **BY MR. HALL:**

14  **Q.**   Oh.  Mr. Lazerus says, "Unfortunately, Allan I don't think

15  can participate right now"; right?

16  **A.**   Correct.

17  **Q.**   And your response is, "Okay."

18       Do you see that?

19  **A.**   Yep.  Yes.

20       **MR. HALL:**  Okay.  Can we scroll down, just make sure

21  we're addressing everything?

22       **THE WITNESS:**  Robert --

23       **THE COURT:**  Just wait.  Wait for the question.

24  **BY MR. HALL:**

25  **Q.**   You also say, in that -- in that bubble now in the bottom

DANKS - DIRECT / HALL

```
 1   of Page 3, "I'm sending a note out to everybody to take" --
 2   "take advantage of the stock."
 3        Why were you doing that?
 4   A.   To calm down the investors.
 5   Q.   And -- well, what did you mean by "take advantage of the
 6   stock"?
 7   A.   Because the stock had come down from the shorting and to
 8   take advantage of the lower price.
 9   Q.   Okay.  Thank you.
10        MR. HALL:  Can we switch now to 470, please.
11        Blow that up.  Thank you.
12   BY MR. HALL:
13   Q.   All right.  Here, what's the date of this?
14   A.   12/11/18.
15   Q.   I'm looking at -- oh.  I see.  That's when it's read.
16        All right.  So you say, "We need 8-dollar bids today."
17   What's that all about?
18   A.   The same thing.  The stock -- the stock was being shorted,
19   and we just wanted to be able to try to get bids in from
20   buyers.
21   Q.   And this is to -- to who?  Robert?
22   A.   I believe it's to Robert Lazerus.
23   Q.   All right.  "And see if you can get anyone to bid at $8
24   and stay there"; right?
25   A.   Correct.
```

1   **Q.**   Well, when you say "bid at $8 and stay there," what did

2   you mean?

3   **A.**   I mean to absorb the stock that comes in at $8.

4   **Q.**   What do you mean by "absorb the stock"?

5   **A.**   Well, when people would -- would try to short the stock

6   down, to stay at $8 or don't let them take it down.

7   **Q.**   Okay.  "And it's all hands."  What's that referencing?

8   **A.**   It means to, like, reach out -- we had a really big

9   database of investors and just wanted to let them all know what

10  was going on and to get involved and take advantage.

11  **Q.**   Okay.  And so this is reflecting it's read in December of

12  2018.

13         **MR. HALL:**  Can we toggle -- or go to Chart 2131,

14  please.

15  **BY MR. HALL:**

16  **Q.**   This is a chart that Mr. Rondeau prepared yesterday.  Do

17  you see the date of December -- December of 2018?  Do you see

18  that on the chart?

19  **A.**   I do.

20         **MR. HALL:**  I don't know -- are we -- is the red -- is

21  the red mark working?

22         **THE COURT:**  It's not.

23         **MR. HALL:**  It is not.

24  **BY MR. HALL:**

25  **Q.**   All right.  What was going on, according to this chart, in

1  December of 2018?

2  **A.**   The stock was -- was reaching down to a low.

3  **Q.**   And was that as a result of -- what was that as a result

4  of?

5  **A.**   Well, if you look at the blue lines, there was -- there

6  was pretty aggressive shorting going on.

7  **Q.**   Okay.  Thank you.

8       **MR. HALL:**  Let's go to 651, please, and blow up that

9  first bubble.

10  **BY MR. HALL:**

11  **Q.**   Okay.  JD is who?

12  **A.**   Jon Destler.

13  **Q.**   All right.  And you're talking about -- what's the date of

14  this again?

15  **A.**   This is 4/25/19.

16  **Q.**   You're talking about buying -- you ended up buying about

17  12,000 shares once it got to the 7.10 range.

18       Are you talking about Loop?

19  **A.**   Yes, I am.

20  **Q.**   And you said you were nervous "I was going to get hit hard

21  at the end of the day, but that didn't happen."  What are you

22  talking about there?

23  **A.**   I was nervous that -- again, the short -- short sellers

24  tend to be pretty aggressive at the end of the day.  So I

25  thought there would be another -- another wave of short selling

DANKS - DIRECT / HALL

```
 1   that would drive the stock down further, and I was nervous, and

 2   it didn't happen.

 3   Q.   Okay.  And -- and you said it was hard to find new buyers.

 4   Were you looking for other investors at that time?

 5   A.   I was -- I'm always looking for new investors, yes.

 6           MR. HALL:  Okay.  And so let's -- let me make sure we

 7   include the bottom portion of this.

 8        Can we scroll, please.

 9   BY MR. HALL:

10   Q.   "Call you in a few.  At urgent care with Sammy, ear

11   infection."

12        Do you know who Sammy is?

13   A.   Jon -- Jon Destler's daughter.

14           MR. HALL:  Okay.  And so -- keep scrolling down,

15   please.

16        These are all from Destler.

17        Keep scrolling, please.

18   BY MR. HALL:

19   Q.   All right.  Here, you are talking -- is this the -- on the

20   same date, April 25th of 2019?

21   A.   Yes, it is.

22   Q.   All right.  And you say, "I just talked to Nelson

23   Switzer."  Who is Nelson Switzer?

24   A.   Nelson Switzer was a senior executive at Loop.

25   Q.   Who's Nelson Gentiletti?
```

1    **A.**   Another senior executive at Loop.

2    **Q.**   Okay.  And who was Bob London?

3    **A.**   Bob London is a longtime investor that I know.

4    **Q.**   Okay.  What does "ready to pull the trigger" mean in that

5    context?

6    **A.**   Bob had been doing a lot of diligence.  He had been

7    talking to the company, and it looks like he was -- he was

8    going to get ready to start building a position.

9    **Q.**   Okay.  And -- okay.

10           **MR. HALL:**  Can we switch back to the Chart 2151,

11   please.

12           **PARALEGAL:**  2151?

13           **MR. HALL:**  Or 2131.  Sorry.  2131.

14       Thank you for catching that.

15   **BY MR. HALL:**

16   **Q.**   Okay.  April of 2019.

17       Can you see what's going on there?

18   **A.**   Very aggressive shorting and taking the stock to a low for

19   this chart.  From -- from -- in this time span, it was -- it

20   was the lowest point of trading.

21   **Q.**   All right.  And how many -- how many short sales are going

22   on -- how many shares being short sold that day?

23   **A.**   Well, that email was on May 1st --

24   **Q.**   Or that month.

25   **A.**   I'm sorry.  Were you --

1  **Q.**    That month --

2  **A.**    That --

3  **Q.**    -- not that day.

4  **A.**    Yeah.

5       Well, it --

6           **THE COURT:**  And "month" meaning April or May?

7           **MR. HALL:**  April of -- of 2019.

8           **THE COURT:**  Thank you.

9           **THE WITNESS:**  There was about 525,000 shares sold

10 short.

11 **BY MR. HALL:**

12 **Q.**    All right.  And what was happening with the price of Loop

13 stock?

14 **A.**    It had gone from, like, $11 to $7.  It lost -- lost

15 probably 40 percent of its value.

16 **Q.**    Thank you.

17      Can we go to 307, please, and -- all right.  This is

18 another text.

19      Who's Veasti?

20 **A.**    It's pronounced "Vesti."

21 **Q.**    "Vesti"?  Okay.

22 **A.**    Yes.  He's one of our original shareholders in Loop.

23 **Q.**    All right.  And this is dated what date?

24 **A.**    5/1/19, the same date as the other email we just looked

25 at, I think.  No, it's not.  5/1- -- 5/1/19.

1    **Q.**   5/1/19; right?

2         And was there a period -- is that in that same period of a

3    lot of shorting going on?

4    **A.**   I believe so.

5    **Q.**   I think -- it was your testimony it was about 525,000

6    shares of Loop had been shorted --

7    **A.**   I believe so.

8    **Q.**   -- the month before?

9    **A.**   I believe so.  I think so.

10   **Q.**   Okay.  Let me -- let's go to 467, please.

11        All right.  This is also that same day?

12   **A.**   Correct.

13   **Q.**   Who's this to?

14   **A.**   To Robert Lazerus.

15   **Q.**   And what are you saying here?

16   **A.**   He -- I think he had mentioned that he was under stress

17   with -- on -- on a margin call, and I was asking him if he was

18   being sold out of his stock and that I had bought 20,000 shares

19   that day.  I'm just trying --

20   **Q.**   Okay.  And it's -- it's 20,000 shares of what stock that

21   day?

22   **A.**   20,000 shares of Loop stock.

23   **Q.**   All right.  Why were you buying Loop stock?

24   **A.**   I was -- I was trying to prevent the stock from cratering

25   with the short selling going on.

DANKS - DIRECT / HALL

1  Q.  All right.  And, again, why was that -- was that important

2  to you, to protect your stock portfolio?

3  A.  Well, me being one of the shareholders, it was to protect

4  the company.  Again, with the capital needs and short sellers

5  being able to break the stock down, which was their goal and

6  plan, I just -- I just felt it necessary to be able to defend

7  against that.

8        MR. HALL:  Okay.  Let me -- can we scroll just to make

9  sure I've covered everything?

10  BY MR. HALL:

11  Q.  What's -- do you see that number there?  What's that?

12  A.  The C6AFE?  That number?

13  Q.  Yes.  Yes.

14  A.  I don't know.

15  Q.  Okay.

16  A.  Oh.  It's next to -- the first text was an accident.  It

17  was probably my granddaughter on my phone.

18  Q.  Okay.  Let's -- they may have done that.

19        Okay.  Let's keep going on.

20  A.  She's very smart because she can repeat the same number.

21  Q.  Okay.  Mr. Lazerus is asking to speak to you before you

22  call Nelson G.

23        Who's Nelson G.?

24  A.  Nelson Gen- -- Nelson Gentiletti.

25  Q.  All right.  Do you recall speaking to him that day?

1  **A.**    I don't remember.

2  **Q.**    Do you remember what this -- why he wanted to talk to you?

3  **A.**    Probably re- -- regarding the -- the pressure that was on

4  the stock and what we were going to do about it.

5  **Q.**    Okay.  Did you know who was shorting the company at this

6  time?

7  **A.**    I had ideas, but I don't know for sure.

8  **Q.**    Was Left one of those?

9  **A.**    I probably -- I -- Andrew Left was probably involved with

10  this.  He had been shorting the stock for a while.

11  **Q.**    Okay.  But this wasn't -- this wasn't the Hindenburg;

12  correct?

13  **A.**    This was pre-Hindenburg.  This was a few months before

14  Hindenburg.

15          **MR. HALL:**  All right.  So -- you can take that down.

16  **BY MR. HALL:**

17  **Q.**    Mr. Danks, did you think that there was anything improper

18  of you -- by you asking people to buy when other people were

19  shorting the company?

20  **A.**    I didn't think there was anything wrong at all because

21  I've seen what happens when you let short sellers control your

22  stock, and we don't have institutional coverage.  We didn't

23  have -- we didn't have a lot of support.

24          So it was up to me to try to build -- build that support

25  and -- and protect the company.

DANKS - DIRECT / HALL

1   Q.   Were you -- were you trying to defraud anybody by asking

2   Allan to sit on a bid?

3   A.   Not at all.  I was -- what I was trying to do was help the

4   company.

5   Q.   Let me switch topics here.

6        Let's talk about -- do you know Michelle Fiore?

7   A.   I know her very well.

8   Q.   All right.  What -- how did you first meet her?

9   A.   I met her through her husband.  I was doing some work for

10  her husband.

11  Q.   All right.  And how long have you known her?

12  A.   I've known her since 1997.

13  Q.   Did there come a time when Ms. Fiore worked for you?

14  Sorry.

15  A.   Can you repeat the question?

16  Q.   Did there come a time when Ms. Fiore worked for you?

17  A.   Yes.  About a year after I met her, I got a phone call

18  from her, and she was looking for a job.  And I happened to

19  need an executive assistant, and she was -- her last job was an

20  executive assistant at the Irvine Company --

21  Q.   Okay.

22  A.   -- include -- including working directly for Donald Bren,

23  the owner of that company, and --

24        THE COURT:  Just -- just wait.

25  ///

DANKS - DIRECT / HALL

1   BY MR. HALL:

2   Q.   I'm just --

3          THE COURT:   I think the question --

4          THE WITNESS:   Oh.  It's yes or no.  Yes or no.

5   BY MR. HALL:

6   Q.   Did you work -- okay.

7   A.   Yeah.  That's a long -- that's a long "yes."

8   Q.   This will go a little quicker --

9   A.   Okay.  Sorry about that.

10  Q.   Okay.  How long did she work for you?

11  A.   She worked for me for almost 11 or 12 years.

12  Q.   And where -- was it in the same location, or did it change

13  locations?

14  A.   It was in the same location.

15  Q.   Where was that?

16  A.   333 East Coast Highway, Corona Del Mar --

17  Q.   All right.  And --

18  A.   -- Suite -- Suite E.

19  Q.   And what were her duties?

20  A.   Oh, she became very valuable.  She -- she primarily -- she

21  handled all my scheduling and -- and appointments and things

22  like that.

23       But she was one of the most charming, energetic people

24  that I had ever met, and she became very involved with investor

25  communications because we had a lot of investors that I had to

1   manage, and they were always trying to get ahold of me.  And

2   she developed relationships with all of them and would -- would

3   handle incoming calls.

4        And she helped -- and she helped me close one particular

5   person to get involved with our company, to get -- that I was

6   working with.  She --

7   **Q.**   Okay.

8   **A.**   She helped close investors --

9   **Q.**   You answered my question.

10  **A.**   -- not companies, yeah.  Sorry.  That was an awkward

11  answer, but you get the point?

12  **Q.**   I believe we do.

13       So let me talk -- so when did you first marry your wife,

14  Terri?

15  **A.**   1984.

16  **Q.**   All right.  And so -- and at the time that Ms. Fiore began

17  working with you -- was what year?  19- -- you said 19- --

18  **A.**   1984.

19  **Q.**   No, but what year did --

20  **A.**   Oh.  She -- 1997.

21  **Q.**   Okay.  And did there come a time when you separated from

22  your wife?

23  **A.**   Yes.

24  **Q.**   What happened?

25  **A.**   In the early 2000s, my oldest son, Aaron, developed a

 1   really severe drug addiction, and his drug of choice was

 2   heroin.  And it became a very, very painful part of my -- my

 3   wife's and my life, and my wife and I kind of diverged on how

 4   to handle it.

 5       I mean, this was a severe -- he started at 15, and he --

 6   he just -- he was -- he was a really severe drug addict, and we

 7   got into fights all the time on how to handle it.  She joined

 8   something called Al-Anon.

 9   **Q.**   Okay.  Let me --

10   **A.**   I'm sorry.

11   **Q.**   Let me kind of --

12   **A.**   You-all wanted to know what happened.  I'm just telling

13   you what happened.

14   **Q.**   No.  No.  Let me see if I can break it up.

15   **A.**   Okay.  Break it up for me.

16   **Q.**   Did you -- did that -- your son's substance abuse

17   problem -- did that put stress on your relationship?

18   **A.**   Enormous amount of stress on our relationship.

19   **Q.**   Were you arguing a lot?

20   **A.**   We were arguing for quite a while because we had different

21   strategies on how to deal with it.

22   **Q.**   Did you -- did you end up separating?

23   **A.**   At first, we just became very indifferent, moved into

24   different rooms, and then eventually we separated in 2005.

25   **Q.**   2005?

1    **A.**    Correct.

2    **Q.**    Did you file for divorce?

3    **A.**    We thought about it and talked about it, but we never did.

4    **Q.**    When you separated, did you leave the -- were you still in

5    separate bedrooms at the house, or did you sleep --

6    **A.**    No.  I -- in October of 2005, I had moved out of the house

7    and moved into an apartment in Laguna Beach.

8    **Q.**    After -- at that time frame, 2005, was Ms. Fiore still

9    working for you?

10   **A.**    Yes.  She had been working for me for almost seven years

11   at that point.

12   **Q.**    All right.  Did you have a romantic relation- -- did you

13   begin a romantic relationship with Ms. Fiore?

14   **A.**    Not -- not right away, but after being separated for, you

15   know, nine months to a year -- so we -- we -- we were buddy --

16   really good friends, and it evolved into a romantic

17   relationship.

18   **Q.**    How long did that romantic relationship last?

19   **A.**    A few years.

20   **Q.**    All right.  But you were still married to your wife at

21   that time?

22   **A.**    We were married and separated and contemplating -- talking

23   divorce but never did.

24   **Q.**    Did there come a time when you moved back into the

25   residence with your wife?

```
 1    A.    Yes.

 2    Q.    Why did you do that?

 3    A.    My son's drug addiction was getting worse, not better.  He

 4    was in rehab out in the desert, and I was speaking with his --

 5    his doctor, and he -- he pulled me aside and said that --

 6          MS. CHOPRA:  Objection, Your Honor.  403.

 7          THE COURT:  Sustained.

 8          THE WITNESS:  What was the --

 9          THE COURT:  The objection was sustained.

10          MR. HALL:  It's sustained.

11          THE COURT:  So you need to wait -- wait for the next

12    question.

13          THE WITNESS:  Oh, wait.  I'm sorry.

14    BY MR. HALL:

15    Q.    Let me ask a question.  Okay?

16    A.    Okay.  Gotcha.

17    Q.    So -- but did you move back into the house with your wife?

18    That's the question.

19    A.    I -- I eventually moved back into the house.

20    Q.    And when was that?

21    A.    I believe it was 2009 or '10.

22    Q.    All right.  At the time that you first moved back into the

23    house, were you still having a romantic relationship with

24    Ms. Fiore?

25    A.    Yes.
```

DANKS - DIRECT / HALL

1  **Q.**   When you moved back into the house --

2  **A.**   When I moved back into the house --

3  **Q.**   Let me -- let me finish the question.

4  **A.**   Okay.

5          **THE COURT:**  Wait for the question.

6          **THE WITNESS:**  Okay.

7  BY MR. HALL:

8  **Q.**   When you moved back into the house, did you move back into

9  the master bedroom with your wife?  Was everything, you know,

10  the same, patched up, or was it still strained?

11  **A.**   It -- it was -- it was still very strained.

12  **Q.**   All right.  Were you living in separate bedrooms?

13  **A.**   We lived in separate bedrooms and didn't have much of a

14  relationship.

15  **Q.**   How long did that last?

16  **A.**   It took about three years for the thaw to end, and it --

17  about three years.

18  **Q.**   Okay.  And during this time that you're back at the

19  residence, are you continuing to have a romantic relationship

20  with Ms. Fiore?

21  **A.**   For -- for a period of time, yes.

22  **Q.**   All right.  Did there come a time when you severed or you

23  stopped that romantic relationship with Ms. Fiore?

24  **A.**   Yes.

25  **Q.**   When?

DANKS - DIRECT / HALL

1    **A.**    I believe it was around 2011.

2    **Q.**    And why?

3    **A.**    I made the decision based on feedback from my son's

4    doctor.  The parents of severe -- my son was a severe drug

5    addict, in his assessment, and parents that separate primarily

6    because of -- it's common because of this kind of problem.

7    Parents have --

8            **MS. CHOPRA:**  Your Honor, objection.  403 again.

9            **THE COURT:**  Sustained.

10    **BY MR. HALL:**

11    **Q.**    So just to -- why did you sever your relationship --

12    **A.**    Because I want -- I didn't stop --

13            **THE COURT:**  Okay.  Wait for the question.

14    **BY MR. HALL:**

15    **Q.**    -- with Ms. Fiore?  Why did you sever your relationship

16    with Ms. Fiore?

17    **A.**    I decided that I wanted to make my marriage work with my

18    wife specifically for my son.

19    **Q.**    How do you feel about how you ended that relationship with

20    Ms. Fiore?

21    **A.**    I -- I felt horrible about it.

22    **Q.**    Why?

23    **A.**    Well, we had become very close, and I had fallen in love

24    with her, but I knew that I had to go home.  And she -- and I

25    felt really -- I felt really horrible about ending it.

1  **Q.**   And -- and that would have been in 2011?

2  **A.**   Sometime around there.  I don't -- the whole -- it was

3  such a dark time in my life.  I think that was about it.

4  **Q.**   Okay.  Was Ms. Fiore still working for you at that time?

5  **A.**   No.  I had let her go in 2009.

6  **Q.**   After you severed the relationship -- the romantic

7  relationship with Ms. Fiore, did you continue to have some

8  other type of relationship with her?

9  **A.**   It transitioned into a really rocky friendship.  We saw

10 each other all the time.  We had mutual friends, but she was

11 really angry about what had happened and -- but it was a

12 friendship.

13      And there were times where she was fine talking to me; and

14 other times, she would just call me all kinds of names because

15 she felt like I had misled her and -- and upset her.

16 **Q.**   Did that -- did that change, though, over time?  Did you

17 become --

18 **A.**   It -- it did.  We --

19 **Q.**   Describe your relationship, say, in 2014.

20 **A.**   By 2014, we had become what I would call buddies.  We --

21 we had been buddies before the romantic relationship, and we

22 got back to being buddies after the relationship.

23 **Q.**   Okay.  In 2014, to be clear, she's not working for you any

24 longer?

25 **A.**   No, she's not.

```
1   Q.   But you'd become buddies?

2   A.   We had become really close friends, yeah.  Like -- like,

3   we knew each other really well and were good friends.

4   Q.   Did you have some discussions with Ms. Fiore about her

5   setting up a company?

6   A.   Yes, I did.

7   Q.   What -- first of all, what was the name of the company?

8   A.   Well, she -- she set up a company called Ventanas Capital.

9   Q.   And did she pick the name, or did you pick the name?

10  A.   She picked the name Ventanas.  I put "Capital" on the back

11  end.

12  Q.   Do you know how she picked that name?

13  A.   She was in Mexico a lot with her horses, and there was a

14  place called Ventanas.  I guess it means "windows."  That was

15  one of her favorite places.  So she picked that as her name --

16  Q.   Did --

17  A.   -- for her company.

18  Q.   All right.  And -- and when she opened up the company, did

19  you discuss what the purpose of that company was to be?

20  A.   What I was going to do is try to help her learn how to

21  invest and build a portfolio and figure out a way to become

22  self-sufficient.

23  Q.   Why were you doing that?

24  A.   Because she couldn't find a job.  She was -- she was

25  always out of money.  I was always giving her a little money
```

 1    here, a little money there.

 2         And she -- and so I said -- and I -- because I cared about

 3    her -- I still care about her -- and to this day, I still care

 4    about her -- I wanted to help her set up a plan to get

 5    financially -- you know, some -- some financial security.

 6    **Q.**   And so did you establish Ventanas, or did she?

 7    **A.**   I think she did, but I think I helped her.

 8    **Q.**   How would you have helped her?

 9    **A.**   Directing her to the Secretary of State of Nevada's

10    website, downloaded the documents and --

11    **Q.**   Do you recall when Ventanas was opened or when that

12    direction to the Secretary of State would have been --

13    **A.**   I believe it was early 2014.  That's when she was kind of

14    at her -- you know, her lowest part of her financial troubles

15    and problems.  So it was early 2014.

16    **Q.**   In 2014, did Ms. Fiore have an accident involving

17    paddleboarding?

18    **A.**   Yeah.  She was in Dana Point Harbor and on a paddle- --

19    standup paddleboard.  And she slipped, fell, hit her head, and

20    had a -- almost a severe -- she had a severe near-drowning

21    accident.

22    **Q.**   At -- at -- how long was she in the hospital?

23    **A.**   For several days.  It was -- it was one where she took a

24    lot of water in her lungs, and it's one of those things where

25    you could -- you could drown after you're -- you're -- you

1   know, after you're taken out of the water, even though you look

2   like you're okay.  They were trying to make sure that she

3   didn't have that.

4   **Q.**    After -- after the accident, did you notice a change in

5   Ms. Fiore?

6   **A.**    Yeah.  I believe she had a concussion along with it

7   because that's what knocked her out, and she -- there was a --

8   there was a pretty severe change in her energy, her mood,

9   her -- just her well-being.  She was way more scattered.  She

10  just seemed to be, like, a little bit of a different person.

11  **Q.**    During that time, was she working?

12  **A.**    No.  She still hadn't found a job.

13  **Q.**    What was she doing for money?

14  **A.**    She didn't have any.  She was -- she was, you know,

15  borrowing from her mom.  She borrowed from me.  She was just

16  trying to stay afloat.  She had a roommate.

17        **MR. HALL:**  Can I ask to pull up 1160?

18      This is not in evidence yet.

19       (Defendants' Exhibit 1160 marked for identification.)

20  **BY MR. HALL:**

21  **Q.**    Mr. Danks, do you see this?

22  **A.**    Yes, I do.

23  **Q.**    What is this?

24  **A.**    After she had the accident --

25  **Q.**    Well, I'm just asking --

DANKS - DIRECT / HALL

1    **A.**    Oh.  I'm sorry.

2    **Q.**    -- what is this?

3    **A.**    It's a promissory note.  That's what it is.

4    **Q.**    Okay.  And -- and who's it between?

5    **A.**    It's between Ventanas Capital, LLC and -- well, this says,

6    "Verical Leap."  It's one of my typos.  It should be "Vertical

7    Leap Advisors."

8         **MR. HALL:**  Okay.  Can we scroll to the second page?

9    **BY MR. HALL:**

10   **Q.**    Do you see a schedule there?

11   **A.**    I do.

12   **Q.**    And there's some handwriting there?

13   **A.**    I do.

14   **Q.**    Whose handwriting is that?

15   **A.**    It looks like it could be Michelle's or --

16   **Q.**    Do you -- do you -- was this a promissory note that you

17   witnessed?

18   **A.**    Yes.  It's a promissory note that I witnessed and funded.

19        **MR. HALL:**  All right.  And can -- may I move for the

20   admission of 1160 at this time?

21        **THE COURT:**  Any objection?

22        **MS. CHOPRA:**  No objection, Your Honor.

23        **THE COURT:**  It may be admitted.

24        **MR. HALL:**  Thank you.

25        (Defendants' Exhibit 1160 received in evidence.)

```
 1   BY MR. HALL:
 2   Q.   Can -- okay.  So what I think the jury is looking at now
 3   is a schedule there.
 4        Do you see those schedule -- that schedule?
 5   A.   Yes, I do see that.
 6   Q.   Okay.  What does -- and it has a date of advance and
 7   amounts advanced.
 8        Does that -- what is that document?
 9   A.   She was in a lot of debt.  She had a house --
10   Q.   I'm just asking:  What is this document?
11   A.   Oh.  What is this document?  I thought, "What is it
12   about?"
13   Q.   What does it -- what does that say?
14   A.   Oh.  It's a schedule -- it's a schedule of monies that
15   were advanced to her.
16   Q.   By whom?
17   A.   By me to her.
18   Q.   Through what company?
19   A.   Through Vertical Leap Advisors.
20   Q.   All right.  And do you remember giving her $11,000 in June
21   of 2014?
22   A.   I do.
23   Q.   And what about 7,000?
24   A.   I do.
25   Q.   I don't want to call them all out.
```

1           **MR. HALL:**  Can we scroll a little bit further down?

2    **BY MR. HALL:**

3    **Q.**   Do you see there -- about the fourth entry from the bottom

4    there, December -- do you see the date December 23rd, 2014?

5    **A.**   Yes, I do.

6    **Q.**   And did -- do you remember giving her $45,000 on that day?

7    **A.**   Yes, I did.

8    **Q.**   Why were you giving her money?

9    **A.**   She was -- I was trying to support her and her horse

10   rescue business that she was trying to get started.

11   **Q.**   And -- and did she -- after that date of December 23rd,

12   2014, did you give her additional amounts after that?

13   **A.**   I did.

14   **Q.**   So do you recall giving her 12,000 in October of 2016?

15   **A.**   Yes.

16   **Q.**   And how much in 2018?

17   **A.**   $12,000.

18   **Q.**   What about the time before?

19   **A.**   Oh.  $20,000 and then $12,000.

20   **Q.**   All right.  So at some point, did you ask Ms. Fiore to

21   sign a promissory note back to you?

22   **A.**   Yes.

23   **Q.**   That's -- that looks like that's a lot of money.  Do you

24   know how much money that was?

25   **A.**   I believe, in total, it was around $150,000.

1   **Q.**   In 2014 or in every -- total?

2   **A.**   Oh.  All -- including all of it.

3          **MR. HALL:**  Okay.  Can we take that down, and can I put

4   up 1161, please.

5          Again, this is not in.

6          (Defendants' Exhibit 1161 marked for identification.)

7   **BY MR. HALL:**

8   **Q.**   Mr. Danks, do you see this document?

9   **A.**   Yes, I do.

10   **Q.**   What is it?

11   **A.**   It's a promissory note for $144,000.

12          **MR. HALL:**  And -- and can you scroll down and look at

13   the signatures, please.

14   **BY MR. HALL:**

15   **Q.**   Do you see a signature there?

16   **A.**   Yes, I do.

17   **Q.**   And -- and who signed that?

18   **A.**   That's Michelle Fiore's signature.

19          **MR. HALL:**  All right.  I would move for admission of

20   11- -- 1161, please.

21          **MS. CHOPRA:**  No objection, Your Honor.

22          **THE COURT:**  1161 may be admitted.

23          (Defendants' Exhibit 1161 received in evidence.)

24          **MR. HALL:**  Can we move up -- go up to the top?

25   ///

DANKS - DIRECT / HALL

1  BY MR. HALL:

2  Q.   Did -- why did you pick the amount of 144,000?

3  A.   I didn't pick the amount.  I -- what I tried to do is

4  provide enough money for her to get out of debt and to help her

5  start her business.

6  Q.   Does this cover those advances that we saw in handwriting

7  on the prior document?

8  A.   Yes.  This correlates to that.

9  Q.   All right.  And can we go to the second page again?

10  Sorry.  Third page.

11       Whose signature is that?

12  A.   That's Michelle Fiore's signature.

13  Q.   All right.  And -- and did she type that in, "Managing

14  Member of Ventanas Capital"?

15  A.   I -- I can't remember whether she did or whether I did.

16  Q.   Okay.  Thank you.

17          MR. HALL:  You can take that down.

18  BY MR. HALL:

19  Q.   When you were forming Loop, did you arrange for stock to

20  be transmitted to Ventanas Capital, LLC?

21  A.   Yes, I did.

22  Q.   Why?

23  A.   I was tired of trying to scramble to get money to -- to

24  support her.  So she had Ventanas -- Ventanas Capital.  So we

25  sat down and talked about -- I get founder shares in the

1  company -- about me carving off some of those founder shares

2  and having her start to build a portfolio.

3  **Q.**   Did she -- was that the only stock that you gave her?

4  **A.**   No.  I gave her stock in -- I gave her stock in

5  Opti-Harvest.  I gave her stock in Trilogy.

6  **Q.**   Did you consider the stock that you gave her through

7  Ventanas -- did that -- you consider that to be your stock?

8  **A.**   It was -- it was stock that could have gone to me.

9  **Q.**   But did you consider it -- when it went to Ventanas, did

10  you consider that to be your stock or --

11  **A.**   No.  No.  I -- I gifted it to her.  It was founder stock

12  at par value, and I gifted it to her.

13  **Q.**   Why did you consider it to be her stock?

14  **A.**   Because I wanted to gift it to her so she could build her

15  own portfolio and start to build some financial independence

16  through building a portfolio and then getting a wealth manager,

17  investing, and be a way to help her -- help her, you know, kind

18  of turn her life around because she was a financial mess.

19  **Q.**   Did you --

20  **A.**   And she owed me a lot of money.

21  **Q.**   Did she -- did you help her in selling that Loop stock?

22  **A.**   I did help her.

23  **Q.**   All right.  How did you help her?

24  **A.**   I have hundreds of investors who are always looking to buy

25  shares that become available privately.  So there was stock

 1   that I gave her.  And when she needed money, she would just
 2   call me up.  And I had plenty of people to go to, and I sold
 3   the stock for her.
 4   Q.   You said she -- when she needed money, she'd call you up.
 5   What -- what would she say?
 6   A.   She'd say, "Hey, I" -- "I need money."  She just -- she
 7   was -- she was very straight.  She was -- she was very excited
 8   we had done this.  She -- you know, it kind of helped repair
 9   all the anger about -- sorry.
10   Q.   But she --
11   A.   Sorry.  Sorry.
12   Q.   She -- would -- would she give you a specific amount of
13   money?
14   A.   Yes, she would.
15   Q.   How often did that happen?
16   A.   It -- first, it wasn't -- it wasn't that frequent, but
17   then it became more frequent as she was going to Mexico more
18   and doing more of her horse business and --
19   Q.   Did she have a lot of expenses?
20   A.   I didn't know what her expenses were, but she did -- she
21   seemed to have a lot of expenses mostly associated with her
22   equestrian business or equestrian activities.
23   Q.   So when she would call you and say, "I need money" -- let
24   me just pick a number, like, 10,000.  Was that an average
25   number?  Was it ballpark?

```
 1   A.    Yeah.  She would -- her needs were between, you know, 8-,

 2   10-, $12,000.  She had mortgages, bills, car payments, all

 3   that, plus her business.

 4   Q.    All right.  So she would call --

 5   A.    She would call and have me --

 6         (Court reporter requests clarification for the record.)

 7             THE COURT:  You can't speak all at once.

 8             THE WITNESS:  I'm sorry.  I was almost done with the

 9   last answer.

10             THE COURT:  Okay.

11             MR. HALL:  That was my fault.  Sorry.

12             THE COURT:  Okay.

13             THE WITNESS:  So -- anyway, should I -- I'm -- I'm

14   done.  I can't remember what I was saying.

15             THE COURT:  Go ahead, Mr. Hall.

16   BY MR. HALL:

17   Q.    When Ms. Fiore would call you and ask for money, what

18   would you do?

19   A.    I would ask her how much, she would tell me, and then I

20   would ask her what stock she wanted to sell.  And then I had

21   lots of buyers, and I would, you know, contact them and say,

22   "Hey, I have some private stock for sale" and a lot of people

23   who wanted it.

24   Q.    Would -- would that include sale of stock for Loop?

25   A.    Yes.
```

1    Q.    Was that the only stock that you sold per sale?

2    A.    No.  She had Trilogy stock, and she had Opti-Harvest

3    stock.

4    Q.    Would she also sell those stocks?

5    A.    Yes, she would.

6    Q.    After she would sell -- after the stock would be sold --

7    well, let me go back.

8          Did you prepare stock purchase agreements to help her do

9    that?

10   A.    Yes.

11   Q.    All right.  And would she always sign those stock purchase

12   agreements?

13   A.    No.  She was in Mexico a lot and hard to get ahold of.

14         As an aside, when she hit her head and went to the

15   hospital, the EMT that rescued her eventually --

16              THE COURT:  I'm going to stop you for a minute --

17              THE WITNESS:  Okay.

18              THE COURT:  -- because I think the question was just:

19   Would she always sign those stock purchase agreements?

20              THE WITNESS:  No.  What she -- what we did is we

21   created electronic signatures.  She signed a couple of them.

22   So I would put electronic signatures on the stock purchase

23   agreements for her.

24   BY MR. HALL:

25   Q.    Would you reach out to other people on her behalf?

 1  **A.**  All the time.

 2  **Q.**  Would she directly communicate with them about the stock

 3  sale, to your knowledge?

 4  **A.**  She had no idea who they were.

 5  **Q.**  Was there -- did you have any discussions with Ms. Fiore

 6  about confidentiality of these transactions?

 7  **A.**  Well, I didn't.  She had -- she had conversations with me.

 8  She wanted -- she -- she didn't want her world to know that she

 9  had assets --

10        **MS. CHOPRA:**  Objection, Your Honor.  Hearsay.

11        **THE COURT:**  Sustained.

12  **BY MR. HALL:**

13  **Q.**  As a result of conversations you had with Ms. Fiore, did

14  you start using other people's names instead of Michelle Fiore?

15  **A.**  Yes.  She --

16  **Q.**  What names?

17  **A.**  David Williams.

18  **Q.**  Who else?

19  **A.**  Oh.  She -- she wanted her name to be used, "Dagmar"

20  instead of "Michelle."

21  **Q.**  And -- and did you have an understanding of what "Dagmar"

22  was?

23  **A.**  Dagmar was her middle name.

24  **Q.**  And as a result of that, did you create documents with the

25  name of Dagmar Fiore?

1  **A.**   No.  She wanted something that was a little more exotic.

2  So we went with -- she said, "M. Dagmar Fiore."

3  **Q.**   All right.  And so did you create documents with the

4  signature space for M. Dagmar Fiore?

5  **A.**   Yes, I did.

6  **Q.**   In fact, you would have created all of the private

7  stock -- would you have created all of the private stock

8  purchase agreements for Ms. Fiore?

9  **A.**   Yes, I did.  I did all of them for her.

10  **Q.**   All right.  And then you would have contacted people to --

11  to do the private transactions with?

12  **A.**   Yes.

13  **Q.**   Who were some of the people you contacted?

14  **A.**   Greg Olafson, Chad Ruyle, I think Tim Joyce.  There's just

15  a number -- a number of people.  I had -- there were a

16  hundred -- over 150 people in this group that would want to buy

17  the stock.

18  **Q.**   We've seen some text messages where you're referencing a

19  David Williams with Ventanas.

20  **A.**   Yes.

21  **Q.**   Do you recall those?

22  **A.**   Yeah.

23  **Q.**   Was there a David Williams with Ventanas?

24  **A.**   There was not a David Williams with Ventanas.

25  **Q.**   Why would you say "David Williams from Ventanas" in your

1  text messages to, say, Greg Olafson, for example?

2  **A.**   All -- all of a sudden, she had some -- some resources,

3  and she -- her -- her sphere -- her sphere of influence, her

4  friends, found out about it, and they were always asking her

5  for money because they -- they --

6           **MS. CHOPRA:**  Objection.   Hearsay, Your Honor.

7           **THE COURT:**  Sustained.

8  **BY MR. HALL:**

9  **Q.**   Why would you use the name David Williams when you were

10  texting Greg Olafson?

11  **A.**   At her request, to keep it anonymous that it was her.

12  **Q.**   But there really wasn't a David Williams; right?

13  **A.**   No, there really wasn't a David Williams.

14  **Q.**   And -- and I think we've seen another text -- I don't want

15  to kill everybody by putting up more texts, but "the guys from

16  Ventanas."

17          Do you remember that phrase?

18  **A.**   Yes, I do.

19  **Q.**   Were there guys at Ventanas?

20  **A.**   No.  It was just to create the illusion that there were

21  people involved just because she wanted the anonymity.

22  **Q.**   And were you doing that for your protection or for her

23  protection?

24  **A.**   Probably -- probably -- well, for her, for sure, and, you

25  know, mine, too, a little bit because I didn't want

1    Michelle Fiore's name all over the place.

2    **Q.**   Did -- at some point, did you go to Schwab with Ms. Fiore

3    to create an account for Ventanas?

4    **A.**   Yes, I did.

5    **Q.**   What -- what happened?

6    **A.**   What happened?

7    **Q.**   At the meeting.

8         Well, where was the meeting?

9    **A.**   The meeting was at Schwab.

10   **Q.**   Who set it up?

11   **A.**   I did.

12   **Q.**   With who?

13   **A.**   With a broker.  His name is Kanin.

14   **Q.**   All right.  And that's the one with that long --

15   **A.**   That long name I can't pronounce.

16   **Q.**   All right.  And did you attend the meeting?

17   **A.**   Yes, I did.

18   **Q.**   And during the meeting, did Ms. Fiore open an account for

19   Ventanas Capital at Schwab?

20   **A.**   Yeah.  She had a personal account, but she wanted to open

21   a new one in Ventanas's name.

22   **Q.**   When was this time frame?  Do you remember when that

23   meeting was?

24   **A.**   Sometime -- it was sometime in 2017, I think -- think

25   early to middle -- early 2017.

1  **Q.**   Are you vague on that?

2  **A.**   I'm vague.

3  **Q.**   Okay.  At the -- at the meeting, did you start out to sign

4  a limited power of attorney?

5  **A.**   No.

6  **Q.**   Did you end up, at the end of the meeting, signing a

7  limited power of attorney?

8  **A.**   Yes, I did.

9  **Q.**   Tell us about how that happened.

10 **A.**   We went through getting the account opened.  It was a very

11 normal meeting.  We filled out -- she filled out all the

12 paperwork, completed it.

13      And -- and towards the end of the meeting -- I was running

14 late for another meeting, but towards the end of the meeting,

15 Kanin started -- started to show her how to trade online

16 because she was going to be down in Mexico a lot and be unable

17 to access her account.

18      She got -- she --

19 **Q.**   Let me interrupt you.

20 **A.**   Okay.

21 **Q.**   At that point in time, had you signed a limited power of

22 attorney?

23 **A.**   No, I hadn't.

24 **Q.**   Okay.  Then what happened?

25 **A.**   She -- she got kind of agitated, saying, "I'm not going to

1    be able to do this."

2              **MS. CHOPRA:**  Objection, Your Honor.  Hearsay.

3              **THE COURT:**  It's only admitted for the effect on the

4    listener.  So it's not for the truth of the matter.  It's only

5    being admitted to show why Mr. Danks did what he did.

6              **MR. HALL:**  Thank you, Your Honor.

7              **THE WITNESS:**  So she got really -- she got very

8    agitated that -- saying -- because, like I said, she had lost a

9    lot of her -- her focus and function.  She was, you know,

10   not -- she was just kind of scattered, and she got frustrated

11   very easily trying to do anything technology-oriented.

12   **BY MR. HALL:**

13   **Q.**   Okay.  And so -- in fact, didn't she have a friend that

14   helps her with her computer?

15   **A.**   Yeah, she did.  She -- she couldn't do anything on the

16   computer.

17   **Q.**   She -- yes?

18   **A.**   Yes, she did have a friend.

19   **Q.**   Okay.  And did she -- did that friend have to help her

20   remember passwords?

21   **A.**   Yeah.  It was -- it was -- it was comical that she had to

22   change it all the time.

23   **Q.**   So -- so let's go back to the meeting.

24        So -- so how did the limited power of attorney come up?

25   **A.**   I'm thinking that the meeting's over.  I'm getting up to

 1   leave, and she's having -- she's staying back to learn how to

 2   trade.  She's agitated, and she says, "No.  I'm not going to be

 3   able to ever" -- "I'm not ever going to be able to do this."

 4        So I go back in.  I said, "This is really easy.  All you

 5   have to do..."

 6        And she goes, "I need help."

 7        I said, "I will" -- you know, "What I'll do is I'll

 8   sell" -- "when you want to sell, just call me.  I'll sell the

 9   trades for you."

10   Q.   All right.  And did the broker interject at that point?

11   A.   He did.  He said, "Well, if you're going to do that, it

12   would be a good day" -- "a good thing to do" -- "we have a

13   program called this limited power of attorney.  It would" --

14   "it" -- "for your" -- "for your protection, in case something

15   happened to her account, that you could" -- "you could sell the

16   trades for her and not have to be at risk."

17   Q.   Did you -- did -- before you -- did you ultimately sign

18   that form?

19   A.   I ultimately did.

20   Q.   All right.  Before you signed the form, did you have

21   questions of the broker?

22   A.   I had a lot of questions of the broker.

23   Q.   Okay.  Don't tell me what the broker said, but I want to

24   know what questions you asked the broker.

25   A.   I asked the broker if I became a limited power of

 1    attorney -- because I had to report -- I was on the board at

 2    Loop.  Would I have -- would I become the beneficial owner of

 3    those shares?  Would I --

 4    **Q.**    Okay.  Okay.  That's one of them?

 5    **A.**    That's one question.

 6    **Q.**    Okay.  Did you ask another question?

 7    **A.**    I did.  I asked --

 8    **Q.**    What was the other question?

 9    **A.**    I asked if -- when -- every time she sells, would I have

10    to file a Form 4, a form that any time -- somebody who's an

11    insider of a company has to file.  Would I have to file Form

12    4s?

13          And he said, "No.  This isn't your account."

14              **THE COURT:**  Wait.  Wait.

15              **THE WITNESS:**  Okay.

16    **BY MR. HALL:**

17    **Q.**    Don't give me the answers.

18    **A.**    Okay.

19    **Q.**    Okay.  Without telling me what he said, did you take

20    action as a result of what was said?

21    **A.**    Yes, I did.

22    **Q.**    And what action did you take?

23    **A.**    I took the action by signing the limited power of

24    attorney.

25    **Q.**    Did you closely scrutinize that form?

1  A.   I didn't read it.  I -- I signed it quickly.  I put my

2  email in it.  And because I was late for a meeting, I left.

3  Q.   All right.  After that, did you trade on the Schwab

4  account?

5  A.   Yes, I did.

6  Q.   Well, did you do that because you were selling your stock

7  or what you thought was your stock?

8  A.   It wasn't my stock.  It was her stock.  She would call,

9  I'd set the trade, and that would be it.

10  Q.   Where would the money go when the stock was sold?

11  A.   All of the money went to her.

12  Q.   Did you ever get any money from the sale of the Schwab

13  account stock?

14  A.   From time to time, I probably did get some because she

15  started to repay the note that she owed me.

16  Q.   All right.  Let's go back to the private sales.

17       The private sales -- we saw some text messages talking

18  about a 35,000-dollar check.

19       Do you remember that?

20  A.   I do.

21  Q.   And -- and you'll split it with her?

22  A.   I do remember that.

23  Q.   Why would you split money from her private sales?

24  A.   Because I had -- I -- I was serious about getting that

25  money back that she owed me that I -- that I loaned to her.  So

1    she would -- I would sell some of her stock, and part of it

2    would go to pay me back.  The rest would go to her.

3    **Q.**   You also texted her about getting -- you needed 5,000 from

4    her because you needed to pay some bills.

5         Do you remember that?

6    **A.**   Yeah.  From time to time, I was in a cash crunch, and I

7    knew she had a lot of cash because I could sell anything and --

8    **Q.**   And would she -- would you credit whatever money she gave

9    to you towards that promissory note?

10   **A.**   Yes, I did.

11   **Q.**   Do you know how much she still owes you?

12   **A.**   She still -- I think she still owes me, you know, about

13   $70,000.

14   **Q.**   All right.  So it never got fully paid off?

15   **A.**   Not fully paid off.

16   **Q.**   You saw Ms. Fiore in court the -- the other day.  I lose

17   track of what day that was.  And was that the -- was -- did she

18   seem to be changed from the times when you were having a

19   romantic relationship with her?

20   **A.**   Michelle Fiore is a shadow of her former self.  I

21   hardly -- I mean, I had seen her, like -- you know, it wasn't

22   shocking because I had seen her, you know, recently.  But

23   she's -- she's -- she's got -- she's a severe alcoholic, and

24   she's very, very, very depressed.

25   **Q.**   We listened to a telephone call between you and some

1  representative for Schwab.  Do you remember listening to that

2  telephone call?

3  **A.**    I do.

4  **Q.**    You said in the telephone call that you were a bit miffed.

5  Do you remember that?

6  **A.**    I do.

7  **Q.**    Why were you a bit miffed?

8  **A.**    Because one time I went on -- onto my Schwab account, her

9  account showed up as well, and I was wondering why those

10  accounts were linked --

11  **Q.**    Did -- did her --

12  **A.**    -- if I --

13  **Q.**    So your account -- your account would have been what

14  account?

15  **A.**    Danks Family Trust.

16  **Q.**    All right.  And did your wife have access to the

17  Danks Family Trust?

18  **A.**    Yes, she did.

19  **Q.**    Well, did you have any concerns that she would see

20  Ventanas Capital?

21  **A.**    Very much so.  My wife didn't know what I -- the

22  arrangements that I had made financially with Michelle.

23  **Q.**    Did she know that you had had an affair?

24  **A.**    Yes.

25  **Q.**    And -- and how did she feel about that?

1    A.    Horr- -- horrible.

2    Q.    Has -- have you resolved that issue with her?

3    A.    We -- we have -- the last 16 years have been -- or last

4    how many years -- the last few years have been wonderful, yes.

5    We have a really good relationship.

6    Q.    And you're still with your wife, Terri, today?

7    A.    We just -- we just celebrated our 40th anniversary.

8    Q.    In that telephone call, you also talk about Ms. Fiore

9    being your business partner.  Do you remember that?

10   A.    Yeah.  I just referred to her as a partner.

11   Q.    Was she really your business partner?

12   A.    No.

13   Q.    Did you ever consider Ventanas as your money?

14   A.    No.

15   Q.    What generally happened with the money from the stock

16   sales?

17   A.    When she would sell stock, except for when I needed to be

18   paid back something, she had complete control over it, did

19   whatever she wanted with it.  It was hers.

20   Q.    Did you keep track of it?

21   A.    Keep track of her -- of her sales?

22   Q.    Of -- no.  Of what -- what she did with the money.

23   A.    No.  I never did.  I never saw her checking account.  I

24   never knew what she did with it.

25        MR. HALL:  If I can have a moment, Your Honor.

 1    BY MR. HALL:

 2    Q.   Did you -- in 2019, did you obtain a margin loan?

 3    A.   I did obtain a margin loan.

 4    Q.   And what was that based on?

 5    A.   It was based on the value of my Loop stock at

 6    TD Ameritrade.

 7    Q.   And what did you do with that loan?

 8    A.   I used that as a down payment -- I had to sell my house

 9    ten years earlier.  So I'm looking for a new house, and Loop

10    was doing well.  And I had acquired a 1 percent margin account

11    from TD, and so I borrowed that money for a down payment on a

12    home.

13    Q.   How did you put the money into the account?

14    A.   How did I put the money into --

15    Q.   The account.

16    A.   What -- which --

17    Q.   That you bought -- well, when you bought the house, did

18    you do it through an escrow company?

19    A.   I did it through, yeah, an escrow company.

20    Q.   All right.  And when you had got the margin loan, did you

21    run it through a series of accounts before you put it into

22    the --

23    A.   No.  I wired directly from --

24    Q.   Okay.  Wait.

25    A.   I'm sorry.  I apologize.

1    Q.    He's going to throw something at me if we keep talking.

2          So did you run the wire through a series of different

3    accounts before you purchased the house?

4    A.    No.

5    Q.    Did you wire it directly from the -- from the company that

6    you obtained the margin loan from to -- to the escrow?

7    A.    I wired directly from the TD Ameritrade Danks Family Trust

8    account to Granite Escrow.

9    Q.    And -- and you made the down payment on the house;

10   correct?

11   A.    On the house, yes.

12   Q.    And that was approximately 518,000?

13   A.    Approximately.  I can't remember exactly, right around

14   that number.

15   Q.    When you did that, were you trying to conceal where that

16   money came from?

17   A.    Not at all.  It was --

18   Q.    Were -- go ahead.

19   A.    Not -- not at all.  It was -- it was easy -- it would be

20   easy to find out that that money came directly from

21   Danks Family Trust to the house.  It was also in the name of

22   the Danks Family Trust.

23   Q.    Also in the name -- the house was in the name of

24   Danks Family Trust?

25   A.    Yes.

1   **Q.**    And the account at -- was it from Schwab or TD Ameritrade?

2   **A.**    TD Ameritrade.

3   **Q.**    Okay.  And what name was that in?

4   **A.**    Danks Family Trust.

5   **Q.**    All right.  So you didn't have any kind of change in

6   names?

7   **A.**    No -- no change in names whatsoever.

8   **Q.**    All right.  Were you doing that to conceal some kind of

9   ownership when you did that?

10  **A.**    Not at all.

11  **Q.**    Were you doing that to disguise the nature of your

12  transaction?

13  **A.**    No.  It was very transparent.

14  **Q.**    Mr. Danks, at the time that you were indicted in

15  connection with this case, how many shares of stock in Loop did

16  you have?

17  **A.**    I had well over a million shares.

18  **Q.**    Why were you still holding onto them?

19  **A.**    I believed -- I believed in Loop.  I believed, and still

20  believe, that Loop is going to be a phenomenal company, and I

21  think those shares are going to be worth a lot of money

22  someday.

23  **Q.**    You heard testimony about -- from one of the agents early

24  on about an annuity pump-and-dump.  Do you remember that

25  testimony?

```
 1   A.    An annuity pump-and-dump?

 2   Q.    Yes.

 3   A.    I don't recall that testimony.

 4   Q.    All right.  Well, it was essentially that some people hold

 5   onto the stock for a long time as part of their pump-and-dump.

 6         Is that what you were doing?

 7   A.    No.

 8   Q.    Again, did you think that you were involved in any kind of

 9   pump-and-dump?

10   A.    Not at all.  As a matter of fact, half of my stock was in

11   my retirement -- my entire retirement account was Loop -- Loop

12   stock.

13   Q.    Did you conspire with any of these people here today to

14   try and defraud people with some kind of pump-and-dump?

15   A.    Not -- no, not at all.

16   Q.    What were you trying to do?

17   A.    Specifically -- can you be more specific?

18   Q.    When you were sending all these texts and things, why were

19   you -- why were you sending those texts?

20   A.    The text messages to --

21   Q.    About sitting on a bid, about holding the line.

22   A.    Oh.  What I was trying to do -- I was -- what I was trying

23   to do -- the company -- the company required capital.  I was

24   trying to make sure that the market didn't collapse because of

25   all of the aggressive shorting that was going on.
```

DANKS - CROSS / HALL

1    **Q.**   And did you think you were defrauding anyone?

2    **A.**   I didn't think I was defrauding anybody.  I thought I was

3    doing, you know, what I should do, and that's to protect

4    shareholders.

5    **Q.**   All right.  Thank you very much.

6            **MR. HALL:**  I have no further questions.  I apologize

7    for ending at this time, Your Honor.

8            **THE COURT:**  Any additional questions on behalf of

9    Mr. Destler?

10           **MR. MILLER:**  No, Your Honor.

11           **THE COURT:**  On behalf of Mr. Lazerus?

12           **MS. HALL:**  Yes, Your Honor.

13           **THE COURT:**  Okay.

14                        <u>**CROSS-EXAMINATION**</u>

15   BY MS. HALL:

16   **Q.**   Good afternoon, Mr. Danks.

17   **A.**   Good afternoon.

18   **Q.**   I just want to ask your team if they could pull up 1219.

19   I believe that was an exhibit that you testified regarding --

20   on direct.

21        Do you recognize that?

22   **A.**   The share exchange agreement?

23   **Q.**   Yes.

24   **A.**   Yes, I do.

25   **Q.**   And that was at the very beginning of the reverse merger

1  and the birth of Loop as we know it; is that right?

2  A.   Correct.

3  Q.   Now, if you will scroll down, please, there are many names

4  on this document; is that right?

5  A.   That's correct, at the very bottom, all the signature

6  pages.

7  Q.   Right.

8       Robert Lazerus's name is not on this document, is it?

9  A.   No, it isn't.

10 Q.   He was not one of the individuals who was involved in this

11 very beginning share distribution, was he?

12 A.   I believe it was with private -- mostly private placement

13 investors, yes, and he wasn't one of them.

14 Q.   He wasn't on the list.  He wasn't a part of that; is that

15 right?

16 A.   Correct.

17 Q.   I want to go now to your testimony about your team and

18 your belief about an NDA.

19      You -- you said that you believed that Mr. Lazerus had an

20 NDA?

21 A.   I am confused about it now, but I -- for a long time, I

22 thought that he had signed one.

23 Q.   You don't have an NDA with Robert Lazerus's name on it, do

24 you?

25 A.   I wouldn't -- I -- if there was one, I wouldn't have it.

 1 | It would have been with the company, and he would have had a

 2 | copy.

 3 | **Q.**   Have you found a copy?  Have you looked for one?

 4 | **A.**   I -- I tried to contact Loop, and they are not cooperating

 5 | with this at all.  So --

 6 | **Q.**   You have not come up with any NDA with Robert's --

 7 | **A.**   I haven't come up with an NDA about Robert.

 8 | **Q.**   Okay.  What --

 9 |          **THE COURT:**  Again, you have to wait until the question

10 | is over and not talk over her.

11 |          **THE WITNESS:**  Oh.  I'm sorry.  I'm sorry.

12 | **BY MS. HALL:**

13 | **Q.**   But what we do have is we do have Text Message 34- -- I

14 | believe it's -- yes, 3449, defense exhibit.

15 |          **MS. HALL:**  Is it warming up?

16 |          **THE CLERK:**  I still don't know which computer --

17 |          **THE COURT:**  3449, yes, is in.

18 |          **MR. YOUNG:**  I think the issue is the computer or

19 | something.

20 |          **THE COURT:**  Oh.

21 |          **MS. HALL:**  Is that at the beginning?  I don't know if

22 | that's -- is that at the beginning?  That doesn't look right.

23 | Is that right?

24 |          **PARALEGAL:**  Are you seeing anything?  Because our

25 | screen is black.

1      **THE COURT:**  No, we're not seeing anything.

2      **MR. HALL:**  Oh.  That's the old -- oh.  Maybe --

3      **THE CLERK:**  It switched over to me.

4      **THE COURT:**  Do you have a hard copy?

5      **MS. HALL:**  I don't have a hard copy with me.

6   I can go -- I can go to a different --

7      **THE COURT:**  Okay.

8      **MS. HALL:**  -- area.  We're almost done --

9      **THE COURT:**  Okay.

10     **MS. HALL:**  -- but I have a -- I have just a few

11  questions.

12  **BY MS. HALL:**

13  **Q.**   Okay.  Mr. Danks, I'm going to ignore the screen for right

14  now because we're having some technical issues.  So I can just

15  ask you some questions directly.

16      You, I believe, testified on direct about having

17  conversations with Allan Brennan; is that right?

18  **A.**   Yes.

19  **Q.**   You had conversations with various investors who -- people

20  who put money into Loop; is that right?

21  **A.**   Correct.

22  **Q.**   You had conversations with investors that had been

23  introduced to Loop by Mr. Lazerus?

24  **A.**   Yes.

25  **Q.**   At no time did any investor tell you that Robert Lazerus

1  had given him or her inside information?

2          MS. CHOPRA:  Objection.  Hearsay.

3          THE COURT:  Sustained.

4  BY MS. HALL:

5  Q.    Did you have any reason to doubt that Mr. Lazerus -- did

6  you have any reason to believe that Mr. Lazerus was somehow

7  violating the team code that you had testified to earlier?

8  A.    Not at all.  I found Robert to be very trustworthy.

9  Q.    You had no reason to believe that he was going out and

10  violating your direction about not releasing inside

11  information?

12  A.    Not at all, and he seemed cautious about it.

13  Q.    And he's someone that you've had a relationship with for

14  many years?

15  A.    We've had a very close relationship for -- probably going

16  on 13 years now.

17  Q.    And, in fact, am I correct that when you heard the tape --

18  the undercover tape of Agent Tarwater talking to Mr. Lazerus,

19  you were surprised?

20  A.    Yes, I was.

21  Q.    Because that was inconsistent with the behavior of

22  Mr. Lazerus over the many years?

23  A.    Inconsistent with everything I knew about him.

24  Q.    Out of character?

25  A.    Out of character.

1          **MS. HALL:**  Do you have 34- -- have you found 3449?

2      Oh.  I don't know if that's quite right.  It doesn't look

3  like it's coming up correctly.

4      Your Honor, is -- is now a good time to break for today?

5  Maybe we can figure this out --

6          **THE COURT:**  Yeah.

7      I would suggest you bring hard copies tomorrow for

8  anything, given how our computers are working out.

9                          (Laughter.)

10          **THE COURT:**  Okay.  I will excuse you, ladies and

11  gentlemen.  You'll be back tomorrow morning at 8:30.

12      If Juror Number 11 can wait out in the hall, the rest of

13  you are excused.  I want to talk to the attorneys.

14                    (End of partial transcript.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, September 17, 2024

8

9

10

11                    /S/ James C. Pence-Aviles

12         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25